# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

EARTH CARE TRADING COMPANY,  )
MARKS & SPARKS, INC., LA RAE  )
ENTERPRISES, LA RAE PARTNERS,  )
SAIRA CORPORATION, S.E.A., INC.,  )
GREENHAUS, INC., RAVEN, INC., AND  )
THE DOLPHIN COMPANY, INC.,  )
  )
    PLAINTIFFS,  )
  )
    v.  )
  )
BUTH-NA-BODHAIGE, INC., d/b/a/  )
THE BODY SHOP, AND THE BODY SHOP  )
INTERNATIONAL PLC,  )
  )
    DEFENDANTS.  )

**FILED**

DEC 2 2000

DAVID W. DANIEL, CLERK
US DISTRICT COURT
E. DIST. N. CAROLINA

COMPLAINT

5:00-CV-949-BO

Plaintiffs Earth Care Trading Company; Marks & Sparks, Inc.; La Rae Enterprises; La Rae Partners; Saira Corporation; S.E.A., Inc.; Greenhaus, Inc.; Raven, Inc.; and The Dolphin Company, Inc. (hereinafter collectively referred as "Plaintiffs"), by way of complaint against defendants Buth-na-Bodhaige, Inc., a Delaware corporation doing business as "The Body Shop," and The Body Shop International PLC allege and say:

## PARTIES

1.    Plaintiff Earth Care Trading Company (hereinafter "Earth Care") is, and at all times hereinafter mentioned was, a Missouri corporation, organized and existing under and by virtue of the laws of the State of Missouri, having its principal place of business at 416 Monticello Drive, Ballwin, Missouri.

2. Plaintiff Marks & Sparks, Inc. (hereinafter "Marks & Sparks") is, and at all times hereinafter mentioned was, a California corporation, organized and existing under and by virtue of the laws of the State of California, having its principal place of business at 169 Horton Plaza, San Diego, California.

3. Plaintiff La Rae Enterprises (hereinafter "La Rae") is, and at all times hereinafter mentioned was, a partnership organized and existing under and by virtue of the laws of the State of Illinois, having its principal place of business at 3 North State Street, Chicago, Illinois.

4. Plaintiff La Rae Partners is, and at all times hereinafter mentioned was, a partnership organized and existing under and by virtue of the laws of the State of Illinois, having its principal place of business at 623 West Diversey, Chicago, Illinois.

5. Plaintiff Saira Corporation (hereinafter "Saira") is, and at all times hereinafter mentioned was, a Pennsylvania corporation, organized and existing under and by virtue of the laws of the State of Pennsylvania, having its principal place of business at 47 St. Georges Street, Ardmore, Pennsylvania.

6. Plaintiff S.E.A., Inc. (hereinafter "S.E.A.") is, and at all times hereinafter mentioned was, a Massachusetts corporation, organized and existing under and by virtue of the laws of the State of Massachusetts, having its principal place of business at 3 Beach Avenue, Salem, Massachusetts.

7. Plaintiff Greenhaus, Inc. (hereinafter "Greenhaus") is, and at all times hereinafter mentioned was, a Florida corporation, organized and existing under and by virtue of the laws of the State of Florida, having its principal place of business at Cordova Mall, 5100 North 9th Avenue, Pensacola, Florida.

8.    Plaintiff Raven, Inc. (hereinafter "Raven") is, and at all times hereinafter mentioned was, a California corporation, organized and existing under and by virtue of the laws of the State of California, having its principal place of business at 172 Santa Monica Place, Santa Monica, California.

9.    Plaintiff The Dolphin Company, Inc. (hereinafter "Dolphin") is, and at all times hereinafter mentioned was, a Kentucky corporation, organized and existing under and by virtue of the laws of the State of Kentucky, having its principal place of business at Fayette Mall, 3615 Nicholasville Road, Suite 824, Lexington, Kentucky.

10.    Upon information and belief, defendant Buth-na-Bodhaige, Inc., d/b/a, The Body Shop (hereinafter "Franchisor") is, and at all times hereinafter mentioned was, a Delaware corporation, organized and existing under and by virtue of the laws of the State of Delaware, having its principal place of business at 5036 One World Way, Wake Forest, North Carolina.  Upon further information and belief, Franchisor is, and at all times hereinafter mentioned was, doing business as "The Body Shop."

11.    Upon information and belief, defendant The Body Shop International, PLC (hereinafter "International") is, and at all times hereinafter mentioned was an English corporation, organized and existing under and by virtue of the laws of the country of England, having its principal place of business at Hawthorn Road, Wick, Littlehampton, West Sussex, England.

## JURISDICTION

12.    This Court has jurisdiction over this action under 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds, exclusive of interest and costs, the sum of Seventy-Five Thousand Dollars ($75,000.00).

13. The court has jurisdiction over Franchisor in that Franchisor is a resident of the judicial district in which the court is located.

14. The court has personal jurisdiction over International in that, upon information and belief:

a. International is engaged in a continuous and systematic course of doing business within the United States and more specifically in the State of North Carolina;

b. International receives monetary payments from Franchisor who is based in North Carolina; and

c. International has availed itself of the laws of the United States.

### VENUE

15. Venue is proper pursuant to written agreements requiring Plaintiffs and Franchisor to bring any dispute related to the agreements which are the subject of the claims herein in a court within the state of North Carolina and under 28 U.S.C. § 1391(a), 28 U.S.C. § 1391(c) and 28 U.S.C. § 1406 as Franchisor resides in the judicial district in which this Court is located. Prior to the commencement of this action La Rae, La Rae Partners, Saira, Greenhaus, and Dolphin have reached an agreement with Franchisor that the venue as set forth is proper.

### COMMON FACTUAL BACKGROUND

16. At all times relevant herein, Franchisor was engaged in the business of selling franchises to operate as business outlets selling proprietary skin and hair care products under the name "The Body Shop." These business outlets (hereinafter "Franchised Stores") operate under an uniform business format, employing sales procedures, trademarks and other proprietary procedures of Franchisor. Franchisor has

4

established a supply and support system for Franchised Stores and is obligated to provide products and services pursuant to certain agreements entered into between Franchisor and the franchisees. Each of the Plaintiffs has entered into one of these agreements or multiple agreements with Franchisor (hereinafter, collectively referred to as "Franchise Agreements"), thus becoming franchisees of Franchisor. The Franchise Agreements define the business relationship between Plaintiffs and Franchisor.

17. Upon information and belief, International has issued a Master Franchise to Franchisor for the exclusive sale of franchises throughout the United States.

18. In or about January 1989, International executed a written guarantee, which guaranteed the performance of all the obligations of Franchisor. This guarantee covered all Franchise Agreements entered into by Franchisor from January 1989 onward.

19. In addition to the sale of Franchised Stores, Franchisor also owns and operates retail stores (hereinafter "Company Stores") which sell the same merchandise under the same format and procedure as the Franchised Stores.

20. Along with sales from the Company Stores, Franchisor also markets and sells its products directly to the public by telephone and mail order through catalogue sales (hereinafter "Catalogue Division").

**Franchisor's Supply System**

21. Pursuant to the Franchise Agreements, Franchisor undertook to be the exclusive supplier of products to the Plaintiffs. Prior to spring of 1998 Franchisor and International were also the manufacturers and packagers of approximately eighty percent of the products that were supplied to the Plaintiffs.

5

22.     Pursuant to Section 3.7 of Franchise Agreements, Franchisor was obligated to make available for purchase by Plaintiffs all of Franchisor's products that were being offered for sale by the retail outlets in Franchisor's franchise system.

23.     Pursuant to paragraph 3.7.1 of Franchise Agreements, Franchisor agreed to allocate products to its Company Stores based on non-discriminatory criteria.

24.     In early 1998, Franchisor and International began to outsource all the manufacturing and/or filling of its products to various third party sources. This manufacturing change was effected over the course of several months.

25.     When outsourcing increased, the Franchisor possessed three warehouses from which all the Company Stores, Franchised Stores and Catalogue Division were supplied. Concurrently with the outsourcing, Franchisor closed its West Coast warehouse and one of its two warehouses located in North Carolina. During the same time the Franchisor reduced the amount of inventory stock it maintained of its products, the Franchisor was depending on the suppliers' deliveries to meet requirements. As a result, the Franchisor is unable to meet the needs of the Franchised Stores, Company Stores and Catalogue Division.

26.     Franchisor currently orders and purchases products from outside sources. These products are stored in the warehouse until they are delivered to Franchised Stores, shipped to Company Stores or mailed out by the Catalogue Division.

27.     Pursuant to the Franchise Agreements, Plaintiffs are required to purchase their products either from Franchisor or from a supplier designated by Franchisor. Franchisor has not designated any alternative suppliers.

28. Pursuant to the Franchise Agreements, Plaintiffs are not permitted to sell any product except that supplied by Franchisor or a supplier designated by Franchisor. Franchisor has not designated any alternative products for the Plaintiff to offer for sale.

29. The Company Stores are supplied from the same warehouse as the Franchised Stores. Company Stores, however, have products shipped to them based on an auto-replenishment system. This system is known by the acronym "FOAD." Prior to the implementation of the FOAD system, Company Stores ordered in the same manner as the Franchised Stores.

30. Upon information and belief, the warehouse reserves stock for the Company Stores and Catalogue Division. This earmarked stock is not available to Plaintiffs' Franchised Stores, even if the supplies for the Plaintiffs' Franchised Stores are exhausted.

31. The Plaintiffs' Franchised Stores order a two-week supply of stock, on a weekly basis. The stock is stored at the Plaintiffs' premises. Plaintiffs are not permitted to store products in Franchisor's warehouse.

7

32.     Upon information and belief, Company Stores and Catalogue Division are not required to pay for their stock, and therefore, are able to maintain a higher in-store stock level. Company Stores and Catalogue Division also are able to maintain stock in the warehouse. Furthermore, Company Stores do not pay for storage of products in the warehouse regardless of the time the products are retained in the warehouse.

33.     Franchisor monitors and replenishes its warehouse stocks by employing a "systemwide inventory" method. The systemwide inventory method measures the total amount of product that is present within the system at any given time. The system encompasses Franchised Stores, Company Stores, Catalogue Division and all sections of the warehouse, whether earmarked or not.

34.     Franchisor has instituted a policy requiring certain franchisees with past due balances to participate in the C.O.D. Plus program. The program requires the franchisees to pay cash for their order, plus an additional fifty percent of the invoice amount for the product prior to shipment. The Franchised Stores must also pay the estimated cost of the shipping prior to the shipment. Upon information and belief, Company Stores are not required to participate in the C.O.D. Plus program. The Franchisor has threatened the application of the C.O.D. Plus program to any franchisee who fails to make timely payments for its supply orders.

35.     Upon information and belief, International has and still does today supply the franchisees outside the United States with stock of their proprietary skin and hair care products.

**The Body Shop Charter and Mission Statement**

36.     Franchisor agreed that pursuant to Section 20 of Franchise Agreements, "The Body Shop Charter" and "Mission Statement" were incorporated into Franchise Agreements and the principles expressed in them binding upon Franchisor.

37.     Pursuant to The Body Shop Charter, Franchisor undertook among other things, the following obligations and duties:

a.      That Franchisor would supply Plaintiffs with products that were "naturally-based";

b.      That Franchisor's products and/or ingredients were not tested on animals; and

c.      That Franchisor would operate in a manner that promoted environmental conservation, fair trade and human rights.

38.     Franchisor marketed its product in recyclable containers. Customers would bring their empty containers to the Plaintiffs' Franchised Stores, which would then ship them to Franchisor for recycling. This system promoted Franchisor's environmentally responsible character.

39.     Franchisor, through The Body Shop Charter and Mission Statement, put forth the concept of a "new way of doing business." This concept included certain principles that would govern the relationship between Franchisor and the franchisees. These principles included building consensus among franchisees, treating franchisees as family, treating all franchisees fairly and heeding their concerns.

9

40.     In approximately 1994, Franchisor created The Committee for Progress as an instrument to bring about its "new way of doing business."   The membership of the committee has varied from 4 to 8 franchisee members and the top leadership of Franchisor.   These franchisee members were elected to this position by their fellow franchisees. It was the function of the franchisee members of the committee to meet with the management of Franchisor and to give their input as to the future course of the franchise system.  The committee also discussed any problems with the system and how management and the franchisees could work together to solve those problems.

41.     Franchisor in addition to The Committee for Progress sponsored other conferences during the year.  These conferences are designed to disseminate information and gather input from the franchisees.  The franchisees could either attend in person or send a representative.

42.     Franchisor has implemented a new point-of-sale system called "STS." The STS system is an accounting program that is linked directly into Plaintiffs' cash registers. The intention behind the STS system was that it would assist Plaintiffs as well as the Franchisor in the sales analysis and accounting portion of their business.

43.     Franchisor has required Plaintiffs to replace their point-of-sale (POS) systems with the STS system and to pay monthly fees for its use.  Plaintiffs were informed that the STS system would produce "timely and accurate" reports and would be a beneficial value to them.

44.     On many occasions the system will automatically implement price markdowns and occasionally loads incorrect prices into Plaintiffs' cash registers without Plaintiffs' knowledge.

45.     At certain times during the year, Franchisor discounts its products in Company Stores and, upon information and belief, also in Catalogue Division.

46.     The discounts are made without consulting the franchisees and as a result, the discounted prices are near or below the prices that the franchisees originally paid to Franchisor to purchase the products.

## FIRST COUNT ON THE BEHALF OF EARTH CARE
## AGAINST FRANCHISOR
### Breach of Contract

47.     Earth Care repeats and reiterates the allegations contained in paragraphs 1 through 46.

48.     On or about August 16, 1990 Earth Care entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at Saint Louis Galleria, St. Louis, Missouri (hereinafter "Galleria"). On or about October 12, 1996 Earth Care renewed the August 16, 1990 Franchise Agreement.

49.     On or about November 14, 1994 Earth Care entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at Crestwood Plaza Shopping Center, St. Louis, Missouri (hereinafter "Crestwood"). On or about November 14, 1999 Earth Care renewed the November 14, 1994 Franchise Agreement.

50.     The Franchise Agreements between the Franchisor and Earth Care are hereinafter referred to as "Earth Care Franchise Agreements."

**Franchisor's breach of supply obligations**

51.     Pursuant to the terms of the Earth Care Franchise Agreements, Earth Care

orders all its products from Franchisor. The products are then shipped from Franchisor's warehouse. Since the shift to outsourcing and the event of reduced warehouse inventory, at any given time, thirty to forty percent of the products ordered by Earth Care are out of stock and are not shipped with its orders.

52.    As a result, Earth Care was and continues to be unable to meet its customer's demand for products, therefore it has lost and continues to lose retail sales and return business.

53.    The supply deficiencies caused by Franchisor have also caused numerous other problems for Earth Care. Franchisor has no system of back ordering in regard to out of stock products. When an ordered product is out of stock, Earth Care must continually contact the warehouse to check on the availability of the product thus causing it to lose valuable time. Earth Care's lack of product is also causing an erosion of its customer base thus contributing to declining sales.

54.    Franchisor will not reorder a product until the systemwide inventory has been depleted to a certain level. The use of this system wide inventory method has resulted in Earth Care not being able to procure certain products. Earth Care's inability to procure the products in this regard is due to the fact that although there is sufficient product available to satisfy the minimum required systemwide level, the product is either located in Company Stores and/or consists of earmarked product in Franchisor's warehouse and is not accessible to Earth Care.

55.    Franchisor has authorized its District Managers ("DSM") to approve transfer of products from Company Stores to Earth Care when requested by Earth Care. Despite Franchisor's assurances that the transfers will be made, when Earth Care requests

a transfer of stock from Company Stores, the DSMs, as a routine course of business, deny the request based on "low inventory levels."

56.     Franchisor repeatedly and constantly fails to make available to Earth Care, either through its designated supplier, or directly from Franchisor, certain products and continues to fail to make products available to Earth Care in sufficient quantities to meet the demand of Earth Care's retail customers.

57.     Franchisor has failed to provide products to Earth Care.

58.     As a result of the failure to supply products, Franchisor is in violation of paragraph 3.7 of Earth Care Franchise Agreements.

**Franchisor's discrimination against the Plaintiff**

59.     The FOAD system favors Company Stores at the cost of Earth Care.

60.     Upon information and belief, Catalogue Division orders are automatically shipped from the existing stock available in the warehouse.

61.     The threatened imposition of the C.O.D. Plus program on Earth Care puts an undue and discriminatory burden upon Earth Care. Company Stores, which are not required to participate in this program, face no hardships created by the arrangement.

62.     That Franchisor's systemwide inventory calculation method is discriminatory in that it favors Company Stores and Catalogue Division at the cost of Earth Care and constitutes a breach of Earth Care Franchise Agreements.

63.     Despite repeated requests, Franchisor has refused to order additional products until the systemwide inventory decreases below a specific level.

64. The discriminatory treatment of Earth Care by the imposition of the FOAD system, the systemwide inventory method and the threatened imposition of the C.O.D. Plus program constitutes a breach of Earth Care Franchise Agreements.

65. Franchisor discriminatorily supplied products to Company Stores and Catalogue Division.

66. As a result of the discriminatory treatment, Franchisor is in violation of paragraph 3.7.1 of Earth Care Franchise Agreements.

**Franchisor's breach of The Body Shop Charter**

67. Franchisor has failed to adhere to the principles set forth in The Body Shop Charter.

68. Upon information and belief, Franchisor supplied to Earth Care products that contained primarily synthetic materials and chemicals and were not naturally-based.

69. Upon information and belief, Franchisor's products or ingredients were tested on animals.

70. Upon information and belief, the sourcing of Franchisor's raw materials and labor used in producing Franchisor's products has had a negative impact on both the environment and the indigenous populations and violated the principles of environmental conservation, fair trade and human rights that Franchisor embodied in the charter and mission statement.

71. Franchisor has ceased accepting the recyclable containers and Franchised Stores now must discard them due to the lack of recycling facilities.

72. Franchisor has failed to adhere to the principles outlined in The Body Shop Charter and Mission Statement.

14

73. By failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in Earth Care Franchise Agreements.

**Failure to adhere to the New Way of Doing Business.**

74. At The Committee for Progress meetings, Plaintiffs directly or through their representatives routinely brought certain problems to the attention of Franchisor. Paramount among these problems was the inadequacy of Franchisor's supply system. Franchisor repeatedly promised that changes would be made to the system in an effort to resolve the supply and other problems. Franchisor has not taken action concerning the overwhelming majority of these promises and more specifically has done nothing to resolve the supply problems faced by Earth Care.

75. In July 2000, Franchisor unilaterally disbanded The Committee for Progress. Franchisor has also severely curtailed Earth Care's participation in other conferences, which it now promotes.

76. Franchisor has failed to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

77. By failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in Earth Care Franchise Agreements.

78. As a result of the foregoing, Earth Care has been damaged in an amount to be determined by the court, but believe to be in excess of Three Hundred Thousand Dollars ($300,000.00).

<u>SECOND COUNT ON THE BEHALF OF EARTH CARE<br>AGAINST FRANCHISOR</u>

Breach of Contract / Rescission

79.     Earth Care repeats and reiterates the allegations contained in paragraphs 1 through 78.

80.     Franchisor breached Earth Care Franchise Agreements by failing to make products available to Earth Care.

81.     Franchisor breached the Earth Care Franchise Agreements as a result of the discriminatory treatment of Franchisor's supply policy.

82.     Franchisor breached Earth Care Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement;

83.     Franchisor breached Earth Care Franchise Agreements by failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

84.     The foregoing breaches were material and substantial.

85.     By reason of the foregoing, Earth Care is entitled to rescission of Earth Care Franchise Agreements entered into by Earth Care for Galleria and Crestwood and for full restitution of any sums.

**THIRD COUNT ON THE BEHALF OF EARTH CARE<br>AGAINST FRANCHISOR**<br>Breach of Contract -- Implied Covenant of Good Faith and Fair Dealing

86.     Earth Care repeats and reiterates the allegations contained in paragraphs 1 through 85.

**Franchisor's breach based on Discriminatory Supplying.**

87.     Franchisor repeatedly and constantly failed to make available to Earth Care, either through its designated supplier or directly from Franchisor, certain products,

16

while at the same time made such products available to its Company Stores and Catalogue Division.

88.     Franchisor continues to fail to make products available to Earth Care in sufficient quantities to meet the demand of Earth Care's retail customers while maintaining full stocks at Company Stores and filling the orders of Catalogue Division. This action by Franchisor is discriminatory in that it favors Company Stores and Catalogue Division at the expense of Earth Care.

89.     As a result, Earth Care was and continues to be unable to meet its customer's demand for products, therefore, it has lost and continues to lose retail sales and return business.

90.     Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Earth Care Franchise Agreements.

**Franchisor's breach of The Body Shop Charter and Mission Statement.**

91.     Franchisor through The Body Shop Charter and Mission Statement put forth the concept of a "new way of doing business."

92.     Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Earth Care Franchise Agreements.

**Franchisor's breaches in the implementation of the "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than retail cost.**

93.     Since its installation in Earth Care's stores, the "STS" system has never worked properly in that it has not produced the promised "timely and accurate data and reports." The claimed time saving benefits have not been realized. In fact, the reports

that the program generates for Earth Care are inadequate. Earth Care must spend additional funds in accounting fees to put the raw data in an useful form.

94.    Upon information and belief, Franchisor has obtained an undisclosed financial or other benefit from the installation of the STS system in franchisees' stores. Such benefit was derived at the expense of Earth Care.

95.    Franchisor's significant discounting prices of products by Company Stores and Catalogue Division has caused Earth Care to lose current sales and profits.

96.    Franchisor by threatening the implementation of its C.O.D. Plus program in a discriminatory manner will impose an unnecessary and extremely burdensome obligation on Earth Care.

97.    Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Earth Care Franchise Agreements.

98.    As a result of Franchisor's breach of the covenant of good faith and fair dealing, Earth Care has sustained damages in an amount to be determined by the court.

## FOURTH COUNT ON THE BEHALF OF EARTH CARE
## AGAINST FRANCHISOR
Implied Covenant of Good Faith and Fair Dealing Breach of Contract / Rescission

99.    Earth Care repeats and reiterates the allegations contained in paragraphs 1 through 98.

100.    Franchisor breached Earth Care Franchise Agreements as a result of its discriminatory supply policy.

101.    Franchisor breached Earth Care Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

18

102. Franchisor breached Earth Care Franchise Agreements in the implementation of "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than Earth Care's cost.

103. The foregoing breaches were material and substantial.

104. By reason of the foregoing, Earth Care is entitled to rescission of Earth Care Franchise Agreements entered into by Earth Care for Galleria and Crestwood and for full restitution of any sums.

## FIFTH COUNT ON THE BEHALF OF EARTH CARE
## AGAINST INTERNATIONAL
### Breach of Contract

105. Earth Care repeats and reiterates the allegations contained in paragraphs 1 through 104.

106. International guaranteed the performance of the obligations of Franchisor under Franchise Agreements.

107. International failed to perform its obligations to Earth Care under the guarantee.

108. Earth Care reasonably relied upon the guarantee of performance when it entered into Earth Care Franchise Agreements with Franchisor.

109. International through its guarantee undertook an affirmative duty to ensure that Earth Care was supplied with adequate stock.

110. International failed to provide Earth Care with stock of its proprietary skin and hair care product while supplying franchisees outside of the United States with stock.

111. By failing to adhere to its obligations under the guarantee, International has breached its obligations and duties agreed to in the guarantee.

19

112.    As a result of the breach of contract, Earth Care has been damaged in an amount to be determined by the court.

## SIXTH COUNT ON THE BEHALF OF MARKS & SPARKS, INC. AGAINST FRANCHISOR
### Breach of Contract

113.    Marks and Sparks, Inc. repeats and reiterates the allegations contained in paragraphs 1 through 46.

114.    On or about June 13, 1991 Marks & Sparks entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at 169 Horton Plaza, San Diego, California (hereinafter "Horton"). On or about June 14, 1996 Marks & Sparks renewed the June 13, 1991 Franchise Agreement.

115.    The Franchise Agreements between the Franchisor and Marks & Sparks, are hereinafter referred to as " Marks & Sparks Franchise Agreements."

**Franchisor's breach of supply obligations**

116.    Pursuant to the terms of the Marks & Sparks Franchise Agreements, Marks & Sparks orders all its products from Franchisor.  The products are then shipped from Franchisor's warehouse. Since the shift to outsourcing and the event of reduced warehouse inventory, at any given time, thirty to forty percent of the products ordered by Marks & Sparks are out of stock and are not shipped with its orders.

117.    As a result, Marks & Sparks was and continues to be unable to meet its customer's demand for products, therefore it, has lost and continues to lose retail sales and return business.

118.    The supply deficiencies caused by Franchisor have also caused numerous other problems for Marks & Sparks. Franchisor has no system of back ordering in regard

20

to out of stock products. When an ordered product is out of stock, Marks & Sparks must continually contact the warehouse to check on the availability of the product thus causing it to lose valuable time. Marks & Sparks' lack of product is also causing an erosion of its customer base thus contributing to declining sales.

119. Franchisor will not reorder a product until the systemwide inventory has been depleted to a certain level. The use of this systemwide inventory method has resulted in Marks & Sparks not being able to procure certain products. Marks & Sparks' inability to procure the products in this regard is due to the fact that although there is sufficient product available to satisfy the minimum required systemwide level, the product is either located in Company Stores and/or consists of earmarked product in Franchisor's warehouse and is not accessible to Marks & Sparks.

120. Franchisor has authorized its DSMs to approve transfer of products from Company Stores to Marks & Sparks when requested by Marks & Sparks. Despite Franchisor's assurances that the transfers will be made, when Marks & Sparks requests a transfer of stock from Company Stores, the DSMs, as a routine course of business, deny the request based on "low inventory levels."

121. Franchisor repeatedly and constantly fails to make available to Marks & Sparks, either through its designated supplier or directly from Franchisor, certain products and continues to fail to make products available to Marks & Sparks in sufficient quantities to meet the demand of Marks & Sparks' retail customers.

122. Franchisor has failed to provide products to Marks & Sparks.

123. As a result of the failure to supply products, Franchisor is in violation of paragraph 3.7 of the Marks & Sparks Franchise Agreements.

21

**Franchisor's discrimination against the Plaintiff**

124. The FOAD system favors Company Stores at the cost of Marks & Sparks.

125. Upon information and belief, Catalogue Division orders are automatically shipped from the existing stock available in the warehouse.

126. The imposition of the C.O.D. Plus program on Marks & Sparks puts an undue and discriminatory burden upon Marks & Sparks. Company Stores, which are not required to participate in this program, face no hardships created by the arrangement.

127. That Franchisor's systemwide inventory calculation method is discriminatory in that it favors the Company Stores and the Catalogue Division at the cost of Marks & Sparks and constitutes a breach of the Marks & Sparks Franchise Agreements.

128. Despite repeated requests, Franchisor has refused to order additional products until the systemwide inventory decreases below a specific level.

129. The discriminatory treatment of Marks & Sparks by the imposition of the FOAD system, the systemwide inventory method and the imposition of the C.O.D. Plus program constitutes a breach of the Marks & Sparks Franchise Agreements.

130. Franchisor discriminatorily supplied products to Company Stores and Catalogue Division.

131. As a result of the discriminatory treatment, Franchisor is in violation of paragraph 3.7.1 of the Marks & Sparks Franchise Agreements.

**Franchisor's breach of The Body Shop Charter**

132. Franchisor has failed to adhere to the principles as set forth in The Body Shop Charter.

133. Upon information and belief, Franchisor supplied to Marks & Sparks products that contained primarily synthetic materials and chemicals and were not naturally-based.

134. Upon information and belief, Franchisor's products or ingredients were tested on animals.

135. Upon information and belief, the sourcing of Franchisor's raw materials and labor used in producing Franchisor's products has had a negative impact on both the environment and the indigenous populations and violated the principles of environmental conservation, fair trade and human rights that Franchisor embodied in the charter and mission statement.

136. Franchisor has ceased accepting the recyclable containers and the Franchised Stores now must discard them due to the lack of recycling facilities.

137. Franchisor has failed to adhere to the principles outlined in The Body Shop Charter and Mission Statement.

138. By failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in the Marks & Sparks Franchise Agreements.

**Failure to adhere to the New Way of Doing Business.**

139. At The Committee for Progress meetings, the Plaintiffs directly or through their representatives routinely brought certain problems to the attention of Franchisor. Paramount among these problems was the inadequacy of Franchisor's supply system. Franchisor repeatedly promised that changes would be made to the system in an effort to resolve the supply and other problems. Franchisor has not taken action concerning the

overwhelming majority of these promises and more specifically has done nothing to resolve the supply problems faced by Marks & Sparks.

140.    In July 2000, Franchisor unilaterally disbanded The Committee for Progress. Franchisor has also severely curtailed Marks & Sparks' participation in other conferences, which it now promotes.

141.    Franchisor has failed to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

142.    By failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in the Marks & Sparks Franchise Agreements.

143.    As a result of the foregoing, Marks & Sparks has been damaged in an amount to be determined by the court, but believe to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

## SEVENTH COUNT ON THE BEHALF OF MARKS & SPARKS, INC. AGAINST FRANCHISOR
Breach of Contract / Rescission

144.    Marks & Sparks repeats and reiterates the allegations contained in paragraphs 1 through 46 and 113 through 143.

145.    Franchisor breached the Marks & Sparks Franchise Agreements by failing to make products available to Marks & Sparks.

146.    Franchisor breached the Marks & Sparks Franchise Agreements as a result of the discriminatory treatment of Franchisor's supply policy.

147.    Franchisor breached the Marks & Sparks Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

24

148.     Franchisor breached the Marks & Sparks Franchise Agreements by failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

149.     The foregoing breaches were material and substantial.

150.     By reason of the foregoing, Marks & Sparks is entitled to rescission of the Marks & Sparks Franchise Agreements entered into by Marks & Sparks for Horton and for full restitution of any sums.

### EIGHTH COUNT ON THE BEHALF OF MARKS & SPARKS, INC. AGAINST FRANCHISOR
Breach of Contract -- Implied Covenant of Good Faith and Fair Dealing

151.     Marks & Sparks repeats and reiterates the allegations contained in paragraphs 1 through 46 and 113 through 150.

**Franchisor's breach based on Discriminatory Supplying.**

152.     Franchisor repeatedly and constantly failed to make available to Marks & Sparks, either through its designated supplier, or directly from Franchisor, certain products, while at the same time made such products available to its Company Stores and Catalogue Division.

153.     Franchisor continues to fail to make products available to Marks & Sparks in sufficient quantities to meet the demand of Marks & Sparks' retail customers while maintaining full stocks at Company Stores and filling the orders of Catalogue Division. This action by Franchisor is discriminatory in that it favors Company Stores and Catalogue Division at the expense of Marks & Sparks.

154. As a result, Marks & Sparks was and continues to be unable to meet its customer's demand for products, therefore, it has lost and continues to lose retail sales and return business.

155. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in the Marks & Sparks Franchise Agreements.

**Franchisor's breach of The Body Shop Charter and Mission Statement.**

156. Franchisor through the Body Shop Charter and the Mission Statement put forth the concept of a "new way of doing business."

157. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in the Marks & Sparks Franchise Agreements.

**Franchisor's breaches in the implementation of the "STS" system, the implementation of the C.O.D. Plus program and its policy of selling products at lower than retail cost.**

158. Since its installation in Marks & Sparks' stores, the "STS" system has never worked properly in that it has not produced the promised "timely and accurate data and reports." The claimed time saving benefits have not been realized. In fact, the reports that the program generates for Marks & Sparks are inadequate. Marks & Sparks must spend additional funds in accounting fees to put the raw data in an useful form.

159. Upon information and belief, Franchisor has obtained an undisclosed financial or other benefit from the installation of the STS system in franchisees' stores. Such benefit was derived at the expense of Marks & Sparks.

160.    Franchisor's significant discounting prices of products by the Company Stores and Catalogue Division has caused Marks & Sparks to lose current sales and profits.

161.    Franchisor by the implementation of its C.O.D. Plus program in a discriminatory manner has imposed an unnecessary and extremely burdensome obligation on Marks & Sparks.

162.    Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in the Marks & Sparks Franchise Agreements.

163.    As a result of Franchisor's breach of the covenant of good faith and fair dealing, Marks & Sparks has sustained damages in an amount to be determined by the court.

## NINTH COUNT ON THE BEHALF OF MARKS & SPARKS, INC. AGAINST FRANCHISOR
Implied Covenant of Good Faith and Fair Dealing Breach of Contract / Rescission

164.    Marks & Sparks repeats and reiterates the allegations contained in paragraphs 1 through 46 and 115 through 163.

165.    Franchisor breached the Marks & Sparks Franchise Agreements as a result of its discriminatory supply policy.

166.    Franchisor breached Marks & Sparks Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

167.    Franchisor breached the Marks & Sparks Franchise Agreements in the implementation of "STS" system, the implementation of the C.O.D. Plus program and its policy of selling products at lower than Marks & Sparks' cost.

27

168. The foregoing breaches were material and substantial.

169. By reason of the foregoing, Marks & Sparks is entitled to rescission of the Marks & Sparks Franchise Agreements entered into by Marks & Sparks for Horton and for full restitution of any sums.

<u>**TENTH COUNT ON THE BEHALF OF MARKS & SPARKS, INC.**</u>
<u>**AGAINST INTERNATIONAL**</u>
Breach of Contract

170. Marks & Sparks repeats and reiterates the allegations contained in paragraphs 1 through 46 and 113 through 169.

171. International guaranteed the performance of the obligations of Franchisor under the Marks & Sparks Franchise Agreements.

172. International failed to perform its obligations to Marks & Sparks under the guarantee.

173. Marks & Sparks reasonably relied upon the guarantee of performance when it entered into the Marks & Sparks Franchise Agreements with Franchisor.

174. International through its guarantee undertook an affirmative duty to ensure that Marks & Sparks was supplied with adequate stock.

175. International failed to provide Marks & Sparks with stock of its proprietary skin and hair care product while supplying franchisees outside of the United States with stock.

176. By failing to adhere to its obligations under the guarantee, International has breached its obligations and duties agreed to in the guarantee.

177. As a result of the breach of contract, Marks & Sparks has been damaged in an amount to be determined by the court.

28

## ELEVENTH COUNT ON THE BEHALF OF LA RAE ENTERPRISES
## AGAINST FRANCHISOR
### Breach of Contract

178.    La Rae repeats and reiterates the allegations contained in paragraphs 1 through 46.

179.    On or about October 8, 1991 La Rae entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at 3 North State Street, Chicago, Illinois ("State Street"). On or about November 11, 1996 La Rae renewed the October 8, 1991 Franchise Agreement.

180.    The Franchise Agreements between the Franchisor and La Rae are hereinafter referred to as "La Rae Franchise Agreements."

**Franchisor's breach of supply obligations**

181.    Pursuant to the terms of the La Rae Franchise Agreements, La Rae orders all its products from Franchisor.   The products are then shipped from Franchisor's warehouse. Since the shift to outsourcing and the event of reduced warehouse inventory, at any given time, thirty to forty percent of the products ordered by La Rae are out of stock and are not shipped with its orders.

182.    As a result, La Rae was and continues to be unable to meet its customer's demand for products, therefore it, has lost and continues to lose retail sales and return business.

183.    The supply deficiencies caused by Franchisor have also caused numerous other problems for La Rae. Franchisor has no system of back ordering in regard to out of stock products.   When an ordered product is out of stock, La Rae must continually contact the warehouse to check on the availability of the product thus causing it to lose

valuable time. La Rae's lack of product is also causing an erosion of its customer base thus contributing to declining sales.

184.    Franchisor will not reorder a product until the systemwide inventory has been depleted to a certain level. The use of this systemwide inventory method has resulted in La Rae not being able to procure certain products. La Rae's inability to procure the products in this regard is due to the fact that although there is sufficient product available to satisfy the minimum required systemwide level, the product is either located in Company Stores and/or consists of earmarked product in Franchisor's warehouse and is not accessible to La Rae.

185.    Franchisor has authorized its DSMs to approve transfer of products from Company Stores to La Rae when requested by La Rae. Despite Franchisor's assurances that the transfers will be made, when La Rae requests a transfer of stock from the Company Stores, the DSMs, as a routine course of business, deny the request based on "low inventory levels."

186.    Franchisor repeatedly and constantly failed to make available to La Rae, either through its designated supplier or directly from Franchisor, certain products and continues to fail to make products available to La Rae in sufficient quantities to meet the demand of La Rae's retail customers.

187.    Franchisor has failed to provide products to La Rae.

188.    As a result of the failure to supply products, Franchisor is in violation of paragraph 3.7 of the La Rae Franchise Agreements.

**Franchisor's discrimination against the Plaintiff**

189.    The FOAD system favors Company Stores at the cost of La Rae.

30

190. Upon information and belief, Catalogue Division orders are automatically shipped from the existing stock available in the warehouse.

191. The threatened imposition of the C.O.D. Plus program on La Rae, puts an undue and discriminatory burden upon La Rae. Company Stores, which are not required to participate in this program, face no hardships created by the arrangement.

192. That Franchisor's systemwide inventory calculation method is discriminatory in that it favors Company Stores and Catalogue Division at the cost of La Rae and constitutes a breach of the La Rae Franchise Agreements.

193. Despite repeated requests, Franchisor has refused to order additional products until the systemwide inventory decreases below a specific level.

194. The discriminatory treatment of La Rae by the imposition of the FOAD system, the systemwide inventory method and the threatened imposition of the C.O.D. Plus program constitutes a breach of La Rae Franchise Agreements.

195. Franchisor discriminatorily supplied products to Company Stores and Catalogue Division.

196. As a result of the discriminatory treatment, Franchisor is in violation of paragraph 3.7.1 of La Rae Franchise Agreements.

**Franchisor's breach of The Body Shop Charter**

197. Franchisor has failed to adhere to the principles as set forth in The Body Shop Charter.

198. Upon information and belief, Franchisor supplied to La Rae products that contained primarily synthetic materials and chemicals and were not naturally-based.

199.   Upon information and belief, Franchisor's products or ingredients were tested on animals.

200.   Upon information and belief, the sourcing of Franchisor's raw materials and labor used in producing Franchisor's products has had a negative impact on both the environment and the indigenous populations and violated the principles of environmental conservation, fair trade and human rights that Franchisor embodied in the charter and mission statement.

201.   Franchisor has ceased accepting the recyclable containers and Franchised Stores now must discard them due to the lack of recycling facilities.

202.   Franchisor has failed to adhere to the principles outlined in The Body Shop Charter and Mission Statement.

203.   By failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in La Rae Franchise Agreements.

**Failure to adhere to the New Way of Doing Business.**

204.   At The Committee for Progress meetings, the Plaintiffs directly or through their representatives routinely brought certain problems to the attention of Franchisor. Paramount among these problems was the inadequacy of Franchisor's supply system. Franchisor repeatedly promised that changes would be made to the system in an effort to resolve the supply and other problems. Franchisor has not taken action concerning the overwhelming majority of these promises and more specifically has done nothing to resolve the supply problems faced by La Rae.

205. In July 2000, Franchisor unilaterally disbanded The Committee for Progress. Franchisor has also severely curtailed La Rae's participation in other conferences, which it now promotes.

206. Franchisor has failed to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

207. By failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in La Rae Franchise Agreements.

208. As a result of the foregoing, La Rae has been damaged in an amount to be determined by the court, but believe to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

### TWELFTH COUNT ON THE BEHALF OF LA RAE ENTERPRISES AGAINST FRANCHISOR
Breach of Contract / Rescission

209. La Rae repeats and reiterates the allegations contained in paragraphs 1 through 46 and 178 through 208.

210. Franchisor breached La Rae Franchise Agreements by failing to make products available to La Rae.

211. Franchisor breached La Rae Franchise Agreements as a result of the discriminatory treatment of Franchisor's supply policy.

212. Franchisor breached La Rae Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

213. Franchisor breached La Rae Franchise Agreements by failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

214. The foregoing breaches were material and substantial.

215. By reason of the foregoing, La Rae is entitled to rescission of the La Rae Franchise Agreements entered into by La Rae for State Street and for full restitution of any sums.

## THIRTEENTH COUNT ON THE BEHALF OF LA RAE ENTERPRISES AGAINST FRANCHISOR
### Breach of Contract -- Implied Covenant of Good Faith and Fair Dealing

216. La Rae repeats and reiterates the allegations contained in paragraphs 1 through 46 and 178 through 215.

**Franchisor's breach based on Discriminatory Supplying.**

217. Franchisor repeatedly and constantly failed to make available to La Rae, either through its designated supplier or directly from Franchisor, certain products, while at the same time made such products available to its Company Stores and Catalogue Division.

218. Franchisor continues to fail to make products available to La Rae in sufficient quantities to meet the demand of La Rae's retail customers while maintaining full stocks at Company Stores and filling the orders of Catalogue Division. This action by Franchisor is discriminatory in that it favors Company Stores and Catalogue Division at the expense of La Rae.

219. As a result, La Rae was and continues to be unable to meet its customer's demand for products, therefore, it has lost and continues to lose retail sales and return business.

220. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in La Rae Franchise Agreements.

**Franchisor's breach of The Body Shop Charter and Mission Statement.**

221. Franchisor through The Body Shop Charter and Mission Statement put forth the concept of a "new way of doing business."

222. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in La Rae Franchise Agreements.

**Franchisor's breaches in the implementation of the "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than retail cost.**

223. Since its installation in La Rae's stores, the "STS" system has never worked properly in that it has not produced the promised "timely and accurate data and reports." The claimed time saving benefits have not been realized. In fact, the reports that the program generates for La Rae are inadequate. La Rae must spend additional funds in accounting fees to put the raw data in an useful form.

224. Upon information and belief, Franchisor has obtained an undisclosed financial or other benefit from the installation of the STS system in franchisees' stores. Such benefit was derived at the expense of La Rae.

225. Franchisor's significant discounting prices of products by Company Stores and Catalogue Division has caused La Rae to lose current sales and profits.

226. Franchisor by threatening the implementation of its C.O.D. Plus program in a discriminatory manner will impose an unnecessary and extremely burdensome obligation on La Rae.

227. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in La Rae Franchise Agreements.

228. As a result of Franchisor's breach of the covenant of good faith and fair dealing, La Rae has sustained damages in an amount to be determined by the court.

## FOURTEENTH COUNT ON THE BEHALF OF LA RAE ENTERPRISES AGAINST FRANCHISOR
Implied Covenant of Good Faith and Fair Dealing Breach of Contract / Rescission

229. La Rae repeats and reiterates the allegations contained in paragraphs 1 through 46 and 178 through 228.

230. Franchisor breached La Rae Franchise Agreements as a result of its discriminatory supply policy.

231. Franchisor breached La Rae Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

232. Franchisor breached La Rae Franchise Agreements in the implementation of "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than La Rae's cost.

233. The foregoing breaches were material and substantial.

235. By reason of the foregoing, La Rae is entitled to rescission of La Rae Franchise Agreements entered into by La Rae for State Street and for full restitution of any sums.

## FIFTEENTH COUNT ON THE BEHALF OF LA RAE ENTERPRISES
## AGAINST INTERNATIONAL
### Breach of Contract

236. Plaintiff La Rae repeats and reiterates the allegations contained in paragraphs 1 through 46 and 178 through 235.

237. International guaranteed the performance of the obligations of Franchisor under La Rae Franchise Agreements.

238. International failed to perform its obligations to La Rae under the guarantee.

239. La Rae reasonably relied upon the guarantee of performance when it entered into the La Rae Franchise Agreements with Franchisor.

240. International through its guarantee undertook an affirmative duty to ensure that La Rae was supplied with adequate stock.

241. International failed to provide La Rae with stock of its proprietary skin and hair care product while supplying franchisees outside of the United States with stock.

242. By failing to adhere to its obligations under the guarantee, International has breached its obligations and duties agreed to in the guarantee.

243. As a result of the breach of contract, La Rae has been damaged in an amount to be determined by the court.

## SIXTEENTH COUNT ON THE BEHALF OF LA RAE PARTNERS
## AGAINST FRANCHISOR
### Breach of Contract

244. La Rae Partners repeats and reiterates the allegations contained in paragraphs 1 through 46.

245. On or about October 20, 1992 La Rae Partners entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at 623 West Diversey, Chicago, Illinois ("Diversey"). On or about October 20, 1997 La Rae Partners renewed the October 20, 1992 Franchise Agreement.

246. The Franchise Agreements between the Franchisor and La Rae Partners are hereinafter referred to as "La Rae Partners Franchise Agreements."

**Franchisor's breach of supply obligations**

247. Pursuant to the terms of La Rae Partners Franchise Agreements, La Rae Partners orders all its products from Franchisor. The products are then shipped from Franchisor's warehouse. Since the shift to outsourcing and the event of reduced warehouse inventory, at any given time, thirty to forty percent of the products ordered by La Rae Partners are out of stock and are not shipped with its orders.

248. As a result, La Rae Partners was and continues to be unable to meet its customer's demand for products, therefore it, has lost and continues to lose retail sales and return business.

249. The supply deficiencies caused by Franchisor have also caused numerous other problems for La Rae Partners. Franchisor has no system of back ordering in regard to out of stock products. When an ordered product is out of stock, La Rae Partners must continually contact the warehouse to check on the availability of the product thus causing it to lose valuable time. La Rae Partners' lack of product is also causing an erosion of its customer base thus contributing to declining sales.

250. Franchisor will not reorder a product until the systemwide inventory has been depleted to a certain level. The use of this systemwide inventory method has

resulted in La Rae Partners not being able to procure certain products. La Rae Partners' inability to procure the products in this regard is due to the fact that although there is sufficient product available to satisfy the minimum required systemwide level, the product is either located in Company Stores and/or consists of earmarked product in Franchisor's warehouse and is not accessible to La Rae Partners.

251. Franchisor has authorized its DSMs to approve transfer of products from Company Stores to La Rae Partners when requested by La Rae Partners. Despite Franchisor's assurances that the transfers will be made, when La Rae Partners request a transfer of stock from Company Stores, the DSMs, as a routine course of business, deny the request based on "low inventory levels."

252. Franchisor repeatedly and constantly failed to make available to La Rae Partners, either through its designated supplier or directly from Franchisor, certain products and continues to fail to make products available to La Rae Partners in sufficient quantities to meet the demand of La Rae Partners' retail customers.

253. Franchisor has failed to provide products to La Rae Partners.

254. As a result of the failure to supply products, Franchisor is in violation of paragraph 3.7 of La Rae Partners Franchise Agreements.

**Franchisor's discrimination against the Plaintiff**

255. The FOAD system favors Company Stores at the cost of La Rae Partners.

256. Upon information and belief, Catalogue Division orders are automatically shipped from the existing stock available in the warehouse.

257. The threatened imposition of the C.O.D. PLUS program on La Rae Partners, puts an undue and discriminatory burden upon La Rae Partners. Company

Stores, which are not required to participate in this program, face no hardships created by the arrangement.

258. That Franchisor's systemwide inventory calculation method is discriminatory in that it favors Company Stores and Catalogue Division at the cost of La Rae Partners and constitutes a breach of La Rae Partners Franchise Agreements.

259. Despite repeated requests, Franchisor has refused to order additional products until the systemwide inventory decreases below a specific level.

260. The discriminatory treatment of La Rae Partners by the imposition of the FOAD system, the systemwide inventory method and the threatened imposition of the C.O.D. Plus program constitutes a breach of La Rae Partners Franchise Agreements.

261. Franchisor discriminatorily supplied products to Company Stores and the Catalogue Division.

262. As a result of the discriminatory treatment, Franchisor is in violation of paragraph 3.7.1 of La Rae Partners Franchise Agreements.

**Franchisor's breach of The Body Shop Charter**

263. Franchisor has failed to adhere to the principles as set forth in The Body Shop Charter.

264. Upon information and belief, Franchisor supplied to La Rae Partners products that contained primarily synthetic materials and chemicals and were not naturally-based.

265. Upon information and belief, Franchisor's products or ingredients were tested on animals.

266. Upon information and belief, the sourcing of Franchisor's raw materials and labor used in producing Franchisor's products has had a negative impact on both the environment and the indigenous populations and violated the principles of environmental conservation, fair trade and human rights that Franchisor embodied in the charter and mission statement.

267. Franchisor has ceased accepting the recyclable containers and Franchised Stores now must discard them due to the lack of recycling facilities.

268. Franchisor has failed to adhere to the principles outlined in The Body Shop Charter and Mission Statement.

269. By failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in La Rae Partners Franchise Agreements.

**Failure to adhere to the New Way of Doing Business.**

270. At The Committee for Progress meetings, the Plaintiffs directly or through their representatives routinely brought certain problems to the attention of Franchisor. Paramount among these problems was the inadequacy of Franchisor's supply system. Franchisor repeatedly promised that changes would be made to the system in an effort to resolve the supply and other problems. Franchisor has not taken action concerning the overwhelming majority of these promises and more specifically has done nothing to resolve the supply problems faced by La Rae Partners.

271. In July 2000, Franchisor unilaterally disbanded The Committee for Progress. Franchisor has also severely curtailed La Rae Partners' participation in other conferences, which it now promotes.

272.   Franchisor has failed to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

273.   By failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in La Rae Partners Franchise Agreements.

274.   As a result of the foregoing, La Rae Partners has been damaged in an amount to be determined by the court, but believe to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

### SEVENTEENTH COUNT ON THE BEHALF OF LA RAE PARTNERS AGAINST FRANCHISOR
Breach of Contract / Rescission

275.   La Rae Partners repeats and reiterates the allegations contained in paragraphs 1 through 46 and 244 through 274.

276.   Franchisor breached La Rae Partners Franchise Agreements by failing to make products available to La Rae Partners.

277.   Franchisor breached La Rae Partners Franchise Agreements as a result of the discriminatory treatment of Franchisor's supply policy.

278.   Franchisor breached La Rae Partners Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

279.   Franchisor breached La Rae Partners Franchise Agreements by failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

280.   The foregoing breaches were material and substantial.

281.   By reason of the foregoing, La Rae Partners is entitled to rescission of the

La Rae Partners Franchise Agreements entered into by La Rae Partners for Diversey and for full restitution of any sums.

### EIGHTEENTH COUNT ON THE BEHALF LA RAE PARTNERS AGAINST FRANCHISOR
Breach of Contract -- Implied Covenant of Good Faith and Fair Dealing

282. La Rae Partners repeat and reiterate the allegations contained in paragraphs 1 through 46 and 244 through 281.

**Franchisor's breach based on Discriminatory Supplying.**

283. Franchisor repeatedly and constantly failed to make available to La Rae Partners, either through its designated supplier or directly from Franchisor, certain products, while at the same time made such products available to its Company Stores and Catalogue Division.

284. Franchisor continues to fail to make products available to La Rae Partners in sufficient quantities to meet the demand of La Rae Partners' retail customers while maintaining full stocks at Company Stores and filling the orders of Catalogue Division. This action by Franchisor is discriminatory in that it favors Company Stores and Catalogue Division at the expense of La Rae Partners.

285. As a result, La Rae Partners was and continues to be unable to meet its customer's demand for products, therefore, it has lost and continues to lose retail sales and return business.

286. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in La Rae Partners Franchise Agreements.

**Franchisor's breach of The Body Shop Charter and Mission Statement.**

287. Franchisor through The Body Shop Charter and Mission Statement put forth the concept of a "new way of doing business."

288. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in La Rae Partners Franchise Agreements.

**Franchisor's breaches in the implementation of the "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than retail cost.**

289. Since its installation in La Rae Partners' stores, the "STS" system has never worked properly in that it has not produced the promised "timely and accurate data and reports." The claimed time saving benefits have not been realized. In fact, the reports that the program generates for La Rae Partners are inadequate. La Rae Partners must spend additional funds in accounting fees to put the raw data in an useful form.

290. Upon information and belief, Franchisor has obtained an undisclosed financial or other benefit from the installation of the STS system in franchisees' stores. Such benefit was derived at the expense of La Rae Partners.

291. Franchisor's significant discounting prices of products by Company Stores and Catalogue Division has caused La Rae Partners to lose current sales and profits.

292. Franchisor by threatening the implementation of its C.O.D. PLUS program in a discriminatory manner will impose an unnecessary and extremely burdensome obligation on La Rae Partners.

293. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in La Rae Partners Franchise Agreements.

294. As a result of Franchisor's breach of the covenant of good faith and fair dealing, La Rae Partners has sustained damages in an amount to be determined by the court.

## NINETEENTH COUNT ON THE BEHALF OF LA RAE PARTNERS AGAINST FRANCHISOR
Implied Covenant of Good Faith and Fair Dealing Breach of Contract / Rescission

295. La Rae Partners repeats and reiterates the allegations contained in paragraphs 1 through 46 and 244 through 294.

296. Franchisor breached La Rae Partners Franchise Agreements as a result of its discriminatory supply policy.

297. Franchisor breached La Rae Partners Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

298. Franchisor breached La Rae Partners Franchise Agreements in the implementation of "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than La Rae Partners' cost.

299. The foregoing breaches were material and substantial.

300. By reason of the foregoing, La Rae Partners is entitled to rescission of the La Rae Partners Franchise Agreements entered into by La Rae Partners for Diversey and for full restitution of any sums.

## TWENTIETH COUNT ON THE BEHALF OF LA RAE PARTNERS AGAINST INTERNATIONAL
Breach of Contract

301. La Rae Partners repeat and reiterate the allegations contained in paragraphs 1 through 46 and 244 through 300.

302. International guaranteed the performance of the obligations of Franchisor under La Rae Partners Franchise Agreements.

303. International failed to perform its obligations to La Rae Partners under the guarantee.

304. La Rae Partners reasonably relied upon the guarantee of performance when it entered into La Rae Partners Franchise Agreements with Franchisor.

305. International through its guarantee undertook an affirmative duty to ensure that La Rae Partners was supplied with adequate stock.

306. International failed to provide La Rae Partners with stock of its proprietary skin and hair care product while supplying franchisees outside of the United States with stock.

307. By failing to adhere to its obligations under the guarantee, International has breached its obligations and duties agreed to in the guarantee.

308. As a result of the breach of contract, La Rae Partners has been damaged in an amount to be determined by the court.

### TWENTY-FIRST COUNT ON THE BEHALF OF SAIRA CORPORATION AGAINST FRANCHISOR
Breach of Contract

309. Saira repeats and reiterates the allegations contained in paragraphs 1 through 46.

310. On or about November 13, 1992 Saira entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at 47 St. Georges Street, Ardmore, Pennsylvania (hereinafter "St. George"). On or about November 10, 1997 Saira renewed the November 13, 1992 Franchise Agreement.

311.   On or about July 24, 1994 Saira entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at Chestnut Street, Philadelphia, Pennsylvania (hereinafter "Chestnut").   On or about July 25, 1999 Saira renewed the July 24, 1994 Franchise Agreement.

312.   The Franchise Agreements between the Franchisor and Saira, are hereinafter referred to as "Saira Franchise Agreements."

**Franchisor's breach of supply obligations**

313.   Pursuant to the terms of Saira Franchise Agreements, Saira orders all its products from Franchisor.   The products are then shipped from Franchisor's warehouse. Since the shift to outsourcing and the event of reduced warehouse inventory, at any given time, thirty to forty percent of the products ordered by Saira are out of stock and are not shipped with its orders.

314.   As a result, Saira was and continues to be unable to meet its customer's demand for products, therefore it, has lost and continues to lose retail sales and return business.

315.   The supply deficiencies caused by Franchisor have also caused numerous other problems for Saira. Franchisor has no system of back ordering in regard to out of stock products.   When an ordered product is out of stock, Saira must continually contact the warehouse to check on the availability of the product thus causing it to lose valuable time. Saira's lack of product is also causing an erosion of its customer base thus contributing to declining sales.

316.   Franchisor will not reorder a product until the systemwide inventory has been depleted to a certain level.   The use of this systemwide inventory method has

resulted in Saira not being able to procure certain products. Saira's inability to procure the products in this regard is due to the fact that although there is sufficient product available to satisfy the minimum required systemwide level, the product is either located in Company Stores and/or consists of earmarked product in Franchisor's warehouse and is not accessible to Saira.

317.   Franchisor has authorized its DSMs to approve transfer of products from Company Stores to Saira when requested by Saira. Despite Franchisor's assurances that the transfers will be made, when Saira requests a transfer of stock from Company Stores, the DSMs, as a routine course of business, deny the request based on "low inventory levels."

318.   Franchisor repeatedly and constantly fails to make available to Saira, either through its designated supplier or directly from Franchisor, certain products and continues to fail to make products available to Saira in sufficient quantities to meet the demand of Saira's retail customers.

319.   Franchisor has failed to provide products to Saira.

320.   As a result of the failure to supply products, Franchisor is in violation of paragraph 3.7 of Saira Franchise Agreements.

**Franchisor's discrimination against the Plaintiff**

321.   The FOAD system favors Company Stores at the cost of Saira.

322.   Upon information and belief, Catalogue Division orders are automatically shipped from the existing stock available in the warehouse.

323. The threatened imposition of the C.O.D. Plus program on Saira, puts an undue and discriminatory burden upon Saira. Company Stores, which are not required to participate in this program, face no hardships created by the arrangement.

324. That Franchisor's systemwide inventory calculation method is discriminatory in that it favors Company Stores and Catalogue Division at the cost of Saira and constitutes a breach of Saira Franchise Agreements.

325. Despite repeated requests, Franchisor has refused to order additional products until the systemwide inventory decreases below a specific level.

326. The discriminatory treatment of Saira by the imposition of the FOAD system, the systemwide inventory method and the threatened imposition of the C.O.D. Plus program constitutes a breach of Saira Franchise Agreements.

327. Franchisor discriminatorily supplied products to Company Stores and Catalogue Division.

328. As a result of the discriminatory treatment, Franchisor is in violation of paragraph 3.7.1 of Saira Franchise Agreements.

**Franchisor's breach of The Body Shop Charter**

329. Franchisor has failed to adhere to the principles as set forth in The Body Shop Charter.

330. Upon information and belief, Franchisor supplied to Saira products that contained primarily synthetic materials and chemicals and were not naturally-based.

331. Upon information and belief, Franchisor's products or ingredients were tested on animals.

332. Upon information and belief, the sourcing of Franchisor's raw materials and labor used in producing Franchisor's products has had a negative impact on both the environment and the indigenous populations and violated the principles of environmental conservation, fair trade and human rights that Franchisor embodied in the charter and mission statement.

333. Franchisor has ceased accepting the recyclable containers and Franchise Stores now must discard them due to the lack of recycling facilities.

334. Franchisor has failed to adhere to the principles outlined in The Body Shop Charter and Mission Statement.

335. By failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in Saira Franchise Agreements.

**Failure to adhere to the New Way of Doing Business.**

336. At The Committee for Progress meetings, the Plaintiffs directly or through their representatives routinely brought certain problems to the attention of Franchisor. Paramount among these problems was the inadequacy of Franchisor's supply system. Franchisor repeatedly promised that changes would be made to the system in an effort to resolve the supply and other problems. Franchisor has not taken action concerning the overwhelming majority of these promises and more specifically has done nothing to resolve the supply problems faced by Saira.

337. In July 2000, Franchisor unilaterally disbanded The Committee for Progress. Franchisor has also severely curtailed Saira's participation in other conferences, which it now promotes.

338. Franchisor has failed to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

339. By failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in Saira Franchise Agreements.

340. As a result of the foregoing, Saira has been damaged in an amount to be determined by the court, but believe to be in excess of Three Hundred Thousand Dollars ($300,000.00).

## TWENTY-SECOND COUNT ON THE BEHALF OF SAIRA CORPORATION AGAINST FRANCHISOR
### Breach of Contract / Rescission

341. Saira repeats and reiterates the allegations contained in paragraphs 1 through 46 and 309 through 340.

342. Franchisor breached Saira Franchise Agreements by failing to make products available to Saira.

343. Franchisor breached Saira Franchise Agreements as a result of the discriminatory treatment of Franchisor's supply policy.

344. Franchisor breached Saira Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

345. Franchisor breached Saira Franchise Agreements by failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

346. The foregoing breaches were material and substantial.

347. By reason of the foregoing, Saira is entitled to rescission of Saira

Franchise Agreements entered into by Saira for St. Georges and Chestnut and for full restitution of any sums.

### TWENTY-THIRD COUNT ON THE BEHALF OF SAIRA CORPORATION AGAINST FRANCHISOR
Breach of Contract -- Implied Covenant of Good Faith and Fair Dealing

348.    Saira repeats and reiterates the allegations contained in paragraphs 1 through 46 and 309 through 347.

**Franchisor's breach based on Discriminatory Supplying.**

349.    Franchisor repeatedly and constantly failed to make available to Saira, either through its designated supplier or directly from Franchisor, certain products, while at the same time made such products available to its Company Stores and Catalogue Division.

350.    Franchisor continues to fail to make products available to Saira in sufficient quantities to meet the demand of Saira's retail customers while maintaining full stocks at Company Stores and filling the orders of Catalogue Division. This action by Franchisor is discriminatory in that it favors Company Stores and Catalogue Division at the expense of Saira.

351.    As a result, Saira was and continues to be unable to meet its customer's demand for products, therefore, it has lost and continues to lose retail sales and return business.

352.    Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Saira Franchise Agreements.

**Franchisor's breach of The Body Shop Charter and Mission Statement.**

353.     Franchisor through The Body Shop Charter and Mission Statement put forth the concept of a "new way of doing business."

354.     Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Saira Franchise Agreements.

**Franchisor's breaches in the implementation of the "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than retail cost.**

355.     Since its installation in Saira' stores, the "STS" system has never worked properly in that it has not produced the promised "timely and accurate data and reports." The claimed time saving benefits have not been realized. In fact, the reports that the program generates for Saira are inadequate. Saira must spend additional funds in accounting fees to put the raw data in an useful form.

356.     Upon information and belief, Franchisor has obtained an undisclosed financial or other benefit from the installation of the STS system in franchisees' stores. Such benefit was derived at the expense of Saira.

357.     Franchisor's significant discounting prices of products by Company Stores and Catalogue Division has caused Saira to lose current sales and profits.

358.     Franchisor by threatening the implementation of its C.O.D. Plus program in a discriminatory manner will impose an unnecessary and extremely burdensome obligation on Saira.

359.     Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in the Saira Franchise Agreements.

360.     As a result of Franchisor's breach of the covenant of good faith and fair dealing, Saira has sustained damages in an amount to be determined by the court.

## TWENTY-FOURTH COUNT ON THE BEHALF OF SAIRA CORPORATION AGAINST FRANCHISOR
Implied Covenant of Good Faith and Fair Dealing Breach of Contract / Rescission

361. Saira repeats and reiterates the allegations contained in paragraphs 1 through 46 and 309 through 360.

362. Franchisor breached Saira Franchise Agreements as a result of its discriminatory supply policy.

363. Franchisor breached Saira Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

364. Franchisor breached Saira Franchise Agreements in the implementation of "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than Saira's cost.

365. The foregoing breaches were material and substantial.

366. By reason of the foregoing, Saira is entitled to rescission of Saira Franchise Agreements entered into by Saira for St. Georges and Chestnut and for full restitution of any sums.

## TWENTY-FIFTH COUNT ON THE BEHALF OF SAIRA CORPORATION AGAINST INTERNATIONAL
Breach of Contract

367. Saira repeats and reiterates the allegations contained in paragraphs 1 through 46 and 309 through 366.

368. International guaranteed the performance of the obligations of Franchisor under Saira Franchise Agreements.

369. International failed to perform its obligations to Saira under the guarantee.

54

370. Saira reasonably relied upon the guarantee of performance when it entered into Saira Franchise Agreements with Franchisor.

371. International through its guarantee undertook an affirmative duty to ensure that Saira was supplied with adequate stock.

372. International failed to provide Saira with stock of its proprietary skin and hair care product while supplying franchisees outside of the United States with stock.

373. By failing to adhere to its obligations under the guarantee, International has breached its obligations and duties agreed to in the guarantee.

374. As a result of the breach of contract, Saira has been damaged in an amount to be determined by the court.

### TWENTY-SIXTH COUNT ON THE BEHALF OF S.E.A., INC. AGAINST FRANCHISOR
Breach of Contract

375. S.E.A. repeats and reiterates the allegations contained in paragraphs 1 through 46.

376. On or about July 31, 1992 S.E.A. entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at 277 Washington Street, Boston, Massachusetts (hereinafter "Washington"). On or about July 31, 1997 S.E.A. renewed the July 31, 1992 Franchise Agreement.

377. On or about September 30, 1993 S.E.A. entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at the Prudential Center, Boston, Massachusetts (hereinafter "Prudential"). On or about September 30, 1998 S.E.A. renewed the September 30, 1993 Franchise Agreement.

378. On or about August 23, 1990 S.E.A. entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at Marketplace Center, 200 State Street, Boston, Massachusetts (hereinafter "Faneuil Hall"). On or about June 14, 1996 S.E.A. renewed the August 23, 1990 Franchise Agreement.

379. The Franchise Agreements between the Franchisor and S.E.A. are hereinafter referred to as "S.E.A. Franchise Agreements."

**Franchisor's breach of supply obligations**

380. Pursuant to the terms of the S.E.A. Franchise Agreements, S.E.A. orders all its products from Franchisor. The products are then shipped from Franchisor's warehouse. Since the shift to outsourcing and the event of reduced warehouse inventory, at any given time, thirty to forty percent of the products ordered by S.E.A. are out of stock and are not shipped with its orders.

381. As a result, S.E.A. was and continues to be unable to meet its customer's demand for products, therefore it, has lost and continues to lose retail sales and return business.

382. The supply deficiencies caused by Franchisor have also caused numerous other problems for S.E.A. Franchisor has no system of back ordering in regard to out of stock products. When an ordered product is out of stock, S.E.A. must continually contact the warehouse to check on the availability of the product thus causing it to lose valuable time. S.E.A.'s lack of product is also causing an erosion of its customer base thus contributing to declining sales.

383. Franchisor will not reorder a product until the systemwide inventory has been depleted to a certain level. The use of this systemwide inventory method has

resulted in S.E.A. not being able to procure certain products. S.E.A.'s inability to procure the products in this regard is due to the fact that although there is sufficient product available to satisfy the minimum required systemwide level, the product is either located in Company Stores and/or consists of earmarked product in Franchisor's warehouse and is not accessible to S.E.A.

384. Franchisor has authorized its DSMs to approve transfer of products from Company Stores to S.E.A. when requested by S.E.A.. Despite Franchisor's assurances that the transfers will be made, when S.E.A. requests a transfer of stock from Company Stores, the DSMs, as a routine course of business, deny the request based on "low inventory levels."

385. Franchisor repeatedly and constantly fails to make available to S.E.A., either through its designated supplier or directly from Franchisor, certain products and continues to fail to make products available to S.E.A. in sufficient quantities to meet the demand of S.E.A.'s retail customers.

386. Franchisor has failed to provide products to S.E.A..

387. As a result of the failure to supply products, Franchisor is in violation of paragraph 3.7 of S.E.A. Franchise Agreements.

**Franchisor's discrimination against the Plaintiff**

388. The FOAD system favors Company Stores at the cost of S.E.A.

389. Upon information and belief, Catalogue Division orders are automatically shipped from the existing stock available in the warehouse.

390. The threatened imposition of the C.O.D. Plus program on S.E.A., puts an undue and discriminatory burden upon S.E.A. Company Stores, which are not required to participate in this program, face no hardships created by the arrangement.

391. That Franchisor's systemwide inventory calculation method is discriminatory in that it favors Company Stores and Catalogue Division at the cost of S.E.A. and constitutes a breach of S.E.A. Franchise Agreements.

392. Despite repeated requests, Franchisor has refused to order additional products until the systemwide inventory decreases below a specific level.

393. The discriminatory treatment of S.E.A. by the imposition of the FOAD system, the systemwide inventory method and the threatened imposition of the C.O.D. Plus program constitutes a breach of S.E.A. Franchise Agreements.

394. Franchisor discriminatorily supplied products to Company Stores and Catalogue Division.

395. As a result of the discriminatory treatment, Franchisor is in violation of paragraph 3.7.1 of S.E.A. Franchise Agreements.

**Failure to adhere to the New Way of Doing Business.**

396. At The Committee for Progress meetings, the Plaintiffs directly or through their representatives routinely brought certain problems to the attention of Franchisor. Paramount among these problems was the inadequacy of Franchisor's supply system. Franchisor repeatedly promised that changes would be made to the system in an effort to resolve the supply and other problems. Franchisor has not taken action concerning the overwhelming majority of these promises and more specifically has done nothing to resolve the supply problems faced by S.E.A.

397. In July 2000, Franchisor unilaterally disbanded The Committee for Progress. Franchisor has also severely curtailed S.E.A.'s participation in other conferences, which it now promotes.

398. Franchisor has failed to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

399. By failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in S.E.A. Franchise Agreements.

400. As a result of the foregoing, S.E.A. has been damaged in an amount to be determined by the court, but believe to be in excess of Four Hundred Fifty Thousand Dollars ($450,000.00).

### TWENTY-SEVENTH COUNT ON THE BEHALF OF S.E.A., INC. AGAINST FRANCHISOR
Breach of Contract -- Implied Covenant of Good Faith and Fair Dealing

401. S.E.A. repeats and reiterates the allegations contained in paragraphs 1 through 46 and 375 through 400.

**Franchisor's breach based on Discriminatory Supplying.**

402. Franchisor repeatedly and constantly failed to make available to S.E.A., either through its designated supplier or directly from Franchisor, certain products, while at the same time made such products available to its Company Stores and Catalogue Division.

403. Franchisor continues to fail to make products available to S.E.A. in sufficient quantities to meet the demand of S.E.A.'s retail customers while maintaining full stocks at Company Stores and filling the orders of Catalogue Division. This action

by Franchisor is discriminatory in that it favors Company Stores and Catalogue Division at the expense of S.E.A.

404. As a result, S.E.A. was and continues to be unable to meet its customer's demand for products, therefore, it has lost and continues to lose retail sales and return business.

405. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in S.E.A. Franchise Agreements.

**Franchisor's breach of The Body Shop Charter and Mission Statement.**

406. Franchisor through The Body Shop Charter and Mission Statement put forth the concept of a "new way of doing business."

407. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in S.E.A. Franchise Agreements.

**Franchisor's breaches in the implementation of the "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than retail cost.**

408. Since its installation in S.E.A.'s stores, the "STS" system has never worked properly in that it has not produced the promised "timely and accurate data and reports." The claimed time saving benefits have not been realized. In fact, the reports that the program generates for S.E.A. are inadequate. S.E.A. must spend additional funds in accounting fees to put the raw data in an useful form.

409. Upon information and belief, Franchisor has obtained an undisclosed financial or other benefit from the installation of the STS system in franchisees' stores. Such benefit was derived at the expense of S.E.A.

410. Franchisor's significant discounting prices of products by Company Stores and Catalogue Division has caused S.E.A. to lose current sales and profits.

411. Franchisor by threatening the implementation of its C.O.D. Plus program in a discriminatory manner will impose an unnecessary and extremely burdensome obligation on S.E.A.

412. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in S.E.A. Franchise Agreements.

413. As a result of Franchisor's breach of the covenant of good faith and fair dealing, S.E.A. has sustained damages in an amount to be determined by the court.

## TWENTY-EIGHTH COUNT ON THE BEHALF OF S.E.A., INC. AGAINST INTERNATIONAL
### Breach of Contract

414. S.E.A. repeats and reiterates the allegations contained in paragraphs 1 through 46 and 375 through 413.

415. International guaranteed the performance of the obligations of Franchisor under S.E.A. Franchise Agreements.

416. International failed to perform its obligations to S.E.A. under the guarantee.

417. S.E.A. reasonably relied upon the guarantee of performance when it entered into S.E.A. Franchise Agreements with Franchisor.

418. International through its guarantee undertook an affirmative duty to ensure that S.E.A. was supplied with adequate stock.

419. International failed to provide S.E.A. with stock of its proprietary skin and hair care product while supplying franchisees outside of the United States with stock.

420. By failing to adhere to its obligations under the guarantee, International has breached its obligations and duties agreed to in the guarantee.

421. As a result of the breach of contract, S.E.A. has been damaged in an amount to be determined by the court.

## TWENTY-NINTH COUNT ON THE BEHALF OF GREENHAUS, INC. AGAINST FRANCHISOR
### Breach of Contract

422. Greenhaus repeats and reiterates the allegations contained in paragraphs 1 through 46.

423. On or about June 27, 1994 Greenhaus entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at Cordova Mall, Pensacola, Florida (hereinafter "Cordova"). On or about June 27, 1999 Greenhaus renewed the June 27, 1994 Franchise Agreement.

424. The Franchise Agreements between the Franchisor and Greenhaus are hereinafter referred to as "Greenhaus Franchise Agreements."

**Franchisor's breach of supply obligations**

425. Pursuant to the terms of Greenhaus Franchise Agreements, Greenhaus orders all its products from Franchisor. The products are then shipped from Franchisor's warehouse. Since the shift to outsourcing and the event of reduced warehouse inventory, at any given time, thirty to forty percent of the products ordered by Greenhaus are out of stock and are not shipped with its orders.

426. As a result, Greenhaus was and continues to be unable to meet its customer's demand for products, therefore it has lost and continues to lose retail sales and return business.

62

427.    The supply deficiencies caused by Franchisor have also caused numerous other problems for Greenhaus. Franchisor has no system of back ordering in regard to out of stock products. When an ordered product is out of stock, Greenhaus must continually contact the warehouse to check on the availability of the product thus causing it to lose valuable time. Greenhaus's lack of product is also causing an erosion of its customer base thus contributing to declining sales.

428.    Franchisor will not reorder a product until the systemwide inventory has been depleted to a certain level. The use of this systemwide inventory method has resulted in Greenhaus not being able to procure certain products. Greenhaus' inability to procure the products in this regard is due to the fact that although there is sufficient product available to satisfy the minimum required systemwide level, the product is either located in Company Stores and/or consists of earmarked product in Franchisor's warehouse and is not accessible to Greenhaus.

429.    Franchisor has authorized its DSMs to approve transfer of products from Company Stores to Greenhaus when requested by Greenhaus. Despite Franchisor's assurances that the transfers will be made, when Greenhaus requests a transfer of stock from the Company Stores, the DSMs, as a routine course of business, deny the request based on "low inventory levels."

430.    Franchisor repeatedly and constantly fails to make available to Greenhaus, either through its designated supplier or directly from Franchisor, certain products and continues to fail to make products available to Greenhaus in sufficient quantities to meet the demand of Greenhaus's retail customers.

431.    Franchisor has failed to provide products to Greenhaus.

432. As a result of the failure to supply products, Franchisor is in violation of paragraph 3.7 of Greenhaus Franchise Agreements.

**Franchisor's discrimination against the Plaintiff**

433. The FOAD system favors Company Stores at the cost of Greenhaus.

434. Upon information and belief, Catalogue Division orders are automatically shipped from the existing stock available in the warehouse.

435. The threatened imposition of the C.O.D. Plus program on Greenhaus, puts an undue and discriminatory burden upon Greenhaus. Company Stores, which are not required to participate in this program, face no hardships created by the arrangement.

436. That Franchisor's systemwide inventory calculation method is discriminatory in that it favors Company Stores and Catalogue Division at the cost of Greenhaus and constitutes a breach of Greenhaus Franchise Agreements.

437. Despite repeated requests, Franchisor has refused to order additional products until the systemwide inventory decreases below a specific level.

438. The discriminatory treatment of Greenhaus by the imposition of the FOAD system, the systemwide inventory method and the threatened imposition of the C.O.D. Plus program constitutes a breach of Greenhaus Franchise Agreements.

439. Franchisor discriminatorily supplied products to Company Stores and Catalogue Division.

440. As a result of the discriminatory treatment, Franchisor is in violation of paragraph 3.7.1 of Greenhaus Franchise Agreements.

**Franchisor's breach of The Body Shop Charter**

441. Franchisor has failed to adhere to the principles as set forth in The Body Shop Charter.

442. Upon information and belief, Franchisor supplied to Greenhaus products that contained primarily synthetic materials and chemicals and were not naturally-based.

443. Upon information and belief, Franchisor's products or ingredients were tested on animals.

444. Upon information and belief, the sourcing of Franchisor's raw materials and labor used in producing Franchisor's products has had a negative impact on both the environment and the indigenous populations and violated the principles of environmental conservation, fair trade and human rights that Franchisor embodied in the charter and mission statement.

445. Franchisor has ceased accepting the recyclable containers and Franchised Stores now must discard them due to the lack of recycling facilities.

446. Franchisor has failed to adhere to the principles outlined in The Body Shop Charter and Mission Statement.

447. By failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in Greenhaus Franchise Agreements.

**Failure to adhere to the New Way of Doing Business.**

448. At The Committee for Progress meetings, the Plaintiffs directly or through their representatives routinely brought certain problems to the attention of Franchisor. Paramount among these problems was the inadequacy of Franchisor's supply system.

Franchisor repeatedly promised that changes would be made to the system in an effort to resolve the supply and other problems. Franchisor has not taken action concerning the overwhelming majority of these promises and more specifically has done nothing to resolve the supply problems faced by Greenhaus.

449. In July 2000, Franchisor unilaterally disbanded The Committee for Progress. Franchisor has also severely curtailed Greenhaus's participation in other conferences, which it now promotes.

450. Franchisor has failed to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

451. By failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in Greenhaus Franchise Agreements.

452. As a result of the foregoing, Greenhaus has been damaged in an amount to be determined by the court, but believe to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

### THIRTIETH COUNT ON THE BEHALF OF GREENHAUS, INC. AGAINST FRANCHISOR
Breach of Contract / Rescission

453. Plaintiff Greenhaus repeats and reiterates the allegations contained in paragraphs 1 through 46 and 422 through 452.

454. Franchisor breached Greenhaus Franchise Agreements by failing to make products available to Greenhaus.

455. Franchisor breached Greenhaus Franchise Agreements as a result of the discriminatory treatment of Franchisor's supply policy.

456. Franchisor breached Greenhaus Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement;

457. Franchisor breached Greenhaus Franchise Agreements by failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

458. The foregoing breaches were material and substantial.

459. By reason of the foregoing, Greenhaus is entitled to rescission of Greenhaus Franchise Agreements entered into by Greenhaus for Cordova and for full restitution of any sums.

### THIRTY-FIRST COUNT ON THE BEHALF OF GREENHAUS, INC. AGAINST FRANCHISOR
Breach of Contract -- Implied Covenant of Good Faith and Fair Dealing

460. Greenhaus repeats and reiterates the allegations contained in paragraphs 1 through 46 and 422 through 459.

**Franchisor's breach based on Discriminatory Supplying.**

461. Franchisor repeatedly and constantly failed to make available to Greenhaus, either through its designated supplier or directly from Franchisor, certain products, while at the same time made such products available to its Company Stores and Catalogue Division.

462. Franchisor continues to fail to make products available to Greenhaus in sufficient quantities to meet the demand of Plaintiff Greenhaus' retail customers while maintaining full stocks at Company Stores and filling the orders of Catalogue Division. This action by Franchisor is discriminatory in that it favors Company Stores and Catalogue Division at the expense of Greenhaus.

463.  As a result, Greenhaus was and continues to be unable to meet its customer's demand for products, therefore, it has lost and continues to lose retail sales and return business.

464.  Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Greenhaus Franchise Agreements.

**Franchisor's breach of The Body Shop Charter and Mission Statement.**

465.  Franchisor through The Body Shop Charter and Mission Statement put forth the concept of a "new way of doing business."

466.  Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Greenhaus Franchise Agreements.

**Franchisor's breaches in the implementation of the "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than retail cost.**

467.  Since its installation in Greenhaus' stores, the "STS" system has never worked properly in that it has not produced the promised "timely and accurate data and reports." The claimed time saving benefits have not been realized. In fact, the reports that the program generates for Greenhaus are inadequate. Greenhaus must spend additional funds in accounting fees to put the raw data in an useful form.

468.  Upon information and belief, Franchisor has obtained an undisclosed financial or other benefit from the installation of the STS system in franchisees' stores. Such benefit was derived at the expense of Greenhaus.

469.  Franchisor's significant discounting prices of products by Company Stores and Catalogue Division has caused Greenhaus to lose current sales and profits.

470. Franchisor by threatening the implementation of its C.O.D. Plus program in a discriminatory manner will impose an unnecessary and extremely burdensome obligation on Greenhaus.

471. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Greenhaus Franchise Agreements.

472. As a result of Franchisor's breach of the covenant of good faith and fair dealing, Greenhaus has sustained damages in an amount to be determined by the court.

## THIRTY-SECOND COUNT ON THE BEHALF OF GREENHAUS, INC. AGAINST FRANCHISOR
Implied Covenant of Good Faith and Fair Dealing Breach of Contract / Rescission

473. Greenhaus repeats and reiterates the allegations contained in paragraphs 1 through 46 and 422 through 472.

474. Franchisor breached Greenhaus Franchise Agreements as a result of its discriminatory supply policy.

475. Franchisor breached Greenhaus Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

476. Franchisor breached Greenhaus Franchise Agreements in the implementation of "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than Greenhaus's cost.

477. The foregoing breaches were material and substantial.

478. By reason of the foregoing, Greenhaus is entitled to rescission of Greenhaus Franchise Agreements entered into by Greenhaus for Cordova and for full restitution of any sums.

## THIRTY-THIRD COUNT ON THE BEHALF OF GREENHAUS, INC.
## AGAINST INTERNATIONAL
### Breach of Contract

479. Greenhaus repeats and reiterates the allegations contained in paragraphs 1 through 46 and 422 through 478.

480. International guaranteed the performance of the obligations of Franchisor under Greenhaus Franchise Agreements.

481. International failed to perform its obligations to Greenhaus under the guarantee.

482. Greenhaus reasonably relied upon the guarantee of performance when it entered into Greenhaus Franchise Agreements with Franchisor.

483. International through its guarantee undertook an affirmative duty to ensure that Greenhaus was supplied with adequate stock.

484. International failed to provide Greenhaus with stock of its proprietary skin and hair care product while supplying franchisees outside of the United States with stock.

485. By failing to adhere to its obligations under the guarantee, International has breached its obligations and duties agreed to in the guarantee.

486. As a result of the breach of contract, Greenhaus has been damaged in an amount to be determined by the court.

## THIRTY-FOURTH COUNT ON THE BEHALF OF RAVEN, INC.
## AGAINST FRANCHISOR
### Breach of Contract

487. Raven repeats and reiterates the allegations contained in paragraphs 1 through 46.

488.	On or about April 5, 1993 Raven entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at Santa Monica Place, Santa Monica, California ("Santa Monica"). On or about April 5, 1998 Raven renewed the April 5, 1993 Franchise Agreement.

489.	The Franchise Agreements between the Franchisor and Raven are hereinafter referred to as "Raven Franchise Agreements."

**Franchisor's breach of supply obligations**

490.	Pursuant to the terms of Raven Franchise Agreements, Raven orders all its products from Franchisor. The products are then shipped from Franchisor's warehouse. Since the shift to outsourcing and the event of reduced warehouse inventory, at any given time, thirty to forty percent of the products ordered by Raven are out of stock and are not shipped with its orders.

491.	As a result, Raven was and continues to be unable to meet its customer's demand for products, therefore it has lost and continues to lose retail sales and return business.

492.	The supply deficiencies caused by Franchisor have also caused numerous other problems for Raven. Franchisor has no system of back ordering in regard to out of stock products. When an ordered product is out of stock, Raven must continually contact the warehouse to check on the availability of the product thus causing it to lose valuable time. Raven's lack of product is also causing an erosion of its customer base thus contributing to declining sales.

493.	Franchisor will not reorder a product until the systemwide inventory has been depleted to a certain level. The use of this systemwide inventory method has

resulted in Raven not being able to procure certain products. Raven's inability to procure the products in this regard is due to the fact that although there is sufficient product available to satisfy the minimum required systemwide level, the product is either located in Company Stores and/or consists of earmarked product in Franchisor's warehouse and is not accessible to Raven.

494. Franchisor has authorized its DSMs to approve transfer of products from Company Stores to Raven when requested by Raven. Despite Franchisor's assurances that the transfers will be made, when Raven requests a transfer of stock from Company Stores, the DSMs, as a routine course of business, deny the request based on "low inventory levels."

495. Franchisor repeatedly and constantly failed to make available to Raven, either through its designated supplier or directly from Franchisor, certain products and continues to fail to make products available to Raven in sufficient quantities to meet the demand of Raven's retail customers.

496. Franchisor has failed to provide products to Raven.

497. As a result of the failure to supply products, Franchisor is in violation of paragraph 3.7 of Raven Franchise Agreements.

**Franchisor's discrimination against the Plaintiff**

498. The FOAD system favors Company Stores at the cost of Raven.

499. Upon information and belief, Catalogue Division orders are automatically shipped from the existing stock available in the warehouse.

500. The threatened imposition of the C.O.D. Plus program on Raven, puts an undue and discriminatory burden upon Raven. Company Stores, which are not required to participate in this program, face no hardships created by the arrangement.

501. That Franchisor's systemwide inventory calculation method is discriminatory in that it favors Company Stores and Catalogue Division at the cost of Raven and constitutes a breach of Raven Franchise Agreements.

502. Despite repeated requests, Franchisor has refused to order additional products until the systemwide inventory decreases below a specific level.

503. The discriminatory treatment of Raven by the imposition of the FOAD system, the systemwide inventory method and the threatened imposition of the C.O.D. Plus program constitutes a breach of Raven Franchise Agreements.

504. Franchisor discriminatorily supplied products to Company Stores and Catalogue Division.

505. As a result of the discriminatory treatment, Franchisor is in violation of paragraph 3.7.1 of Raven Franchise Agreements.

**Franchisor's breach of The Body Shop Charter**

506. Franchisor has failed to adhere to the principles as set forth in The Body Shop Charter.

507. Upon information and belief, Franchisor supplied to Raven products that contained primarily synthetic materials and chemicals and were not naturally-based.

508. Upon information and belief, Franchisor's products or ingredients were tested on animals.

509. Upon information and belief, the sourcing of Franchisor's raw materials and labor used in producing Franchisor's products has had a negative impact on both the environment and the indigenous populations and violated the principles of environmental conservation, fair trade and human rights that Franchisor embodied in the charter and mission statement.

510. Franchisor has ceased accepting the recyclable containers and Franchised Stores now must discard them due to the lack of recycling facilities.

511. Franchisor has failed to adhere to the principles outlined in The Body Shop Charter and Mission Statement.

512. By failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in Raven Franchise Agreements.

**Failure to adhere to the New Way of Doing Business.**

513. At The Committee for Progress meetings, the Plaintiffs directly or through their representatives routinely brought certain problems to the attention of Franchisor. Paramount among these problems was the inadequacy of Franchisor's supply system. Franchisor repeatedly promised that changes would be made to the system in an effort to resolve the supply and other problems. Franchisor has not taken action concerning the overwhelming majority of these promises and more specifically has done nothing to resolve the supply problems faced by Raven.

514. In July 2000, Franchisor unilaterally disbanded The Committee for Progress. Franchisor has also severely curtailed Raven's participation in other conferences, which it now promotes.

515. Franchisor has failed to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

516. By failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and The Mission Statement, Franchisor has breached its obligations and duties agreed to in Raven Franchise Agreements.

517. As a result of the foregoing, Raven has been damaged in an amount to be determined by the court, but believe to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

## THIRTY-FIFTH COUNT ON THE BEHALF OF RAVEN, INC. AGAINST FRANCHISOR
### Breach of Contract / Rescission

518. Raven repeats and reiterates the allegations contained in paragraphs 1 through 46 and 487 through 517.

519. Franchisor breached Raven Franchise Agreements by failing to make products available to Raven.

520. Franchisor breached Raven Franchise Agreements as a result of the discriminatory treatment of Franchisor's supply policy.

521. Franchisor breached Raven Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement;

522. Franchisor breached Raven Franchise Agreements by failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

523. The foregoing breaches were material and substantial.

524. By reason of the foregoing, Raven is entitled to rescission of Raven

Franchise Agreements entered into by Raven for Santa Monica and for full restitution of any sums.

**THIRTY-SIXTH COUNT ON THE BEHALF OF RAVEN, INC.**
**AGAINST FRANCHISOR**
Breach of Contract -- Implied Covenant of Good Faith and Fair Dealing

525. Plaintiff Raven repeats and reiterates the allegations contained in paragraphs 1 through 46 and 487 through 524.

**Franchisor's breach based on Discriminatory Supplying.**

526. Franchisor repeatedly and constantly failed to make available to Raven, either through its designated supplier or directly from Franchisor, certain products, while at the same time made such products available to its Company Stores and Catalogue Division.

527. Franchisor continues to fail to make products available to Raven in sufficient quantities to meet the demand of Raven's retail customers while maintaining full stocks at Company Stores and filling the orders of Catalogue Division. This action by Franchisor is discriminatory in that it favors Company Stores and Catalogue Division at the expense of Raven.

528. As a result, Raven was and continues to be unable to meet its customer's demand for products, therefore, it has lost and continues to lose retail sales and return business.

529. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Raven Franchise Agreements.

**Franchisor's breach of The Body Shop Charter and Mission Statement.**

530. Franchisor through The Body Shop Charter and Mission Statement put forth the concept of a "new way of doing business."

531. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Raven Franchise Agreements.

**Franchisor's breaches in the implementation of the "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than retail cost.**

532. Since its installation in Raven's stores, the "STS" system has never worked properly in that it has not produced the promised "timely and accurate data and reports." The claimed time saving benefits have not been realized. In fact, the reports that the program generates for Raven are inadequate. Raven must spend additional funds in accounting fees to put the raw data in an useful form.

533. Upon information and belief, Franchisor has obtained an undisclosed financial or other benefit from the installation of the STS system in franchisees' stores. Such benefit was derived at the expense of Raven.

534. Franchisor's significant discounting prices of products by Company Stores and Catalogue Division has caused Raven to lose current sales and profits.

535. Franchisor by threatening the implementation of its C.O.D. Plus program in a discriminatory manner will impose an unnecessary and extremely burdensome obligation on Raven.

536. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Raven Franchise Agreements.

537. As a result of Franchisor's breach of the covenant of good faith and fair dealing, Raven has sustained damages in an amount to be determined by the court.

## THIRTY-SEVENTH COUNT ON THE BEHALF OF RAVEN, INC.
## AGAINST FRANCHISOR
Implied Covenant of Good Faith and Fair Dealing Breach of Contract / Rescission

538.    Raven repeats and reiterates the allegations contained in paragraphs 1 through 46 and 487 through 537.

539.    Franchisor breached Raven Franchise Agreements as a result of its discriminatory supply policy.

540.    Franchisor breached Raven Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

541.    Franchisor breached Raven Franchise Agreements in the implementation of "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than Raven's cost.

542.    The foregoing breaches were material and substantial.

543.    By reason of the foregoing, Raven is entitled to rescission of Raven Franchise Agreements entered into by Raven for Santa Monica and for full restitution of any sums.

## THIRTY-EIGHTH COUNT ON THE BEHALF OF RAVEN, INC.
## AGAINST INTERNATIONAL
Breach of Contract

544.    Raven repeats and reiterates the allegations contained in paragraphs 1 through 46 and 487 through 543.

545.    International guaranteed the performance of the obligations of Franchisor under Raven Franchise Agreements.

546. International failed to perform its obligations to Raven under the guarantee.

547. Raven reasonably relied upon the guarantee of performance when it entered into Raven Franchise Agreements with Franchisor.

548. International through its guarantee undertook an affirmative duty to ensure that Raven was supplied with adequate stock.

549. International failed to provide Raven with stock of its proprietary skin and hair care product while supplying franchisees outside of the United States with stock.

550. By failing to adhere to its obligations under the guarantee, International has breached its obligations and duties agreed to in the guarantee.

551. As a result of the breach of contract, Raven has been damaged in an amount to be determined by the court.

### THIRTY-NINTH COUNT ON THE BEHALF OF
### THE DOLPHIN COMPANY, INC. AGAINST FRANCHISOR
Breach of Contract

552. Dolphin repeats and reiterates the allegations contained in paragraphs 1 through 46.

553. On or about May 6, 1993 Dolphin entered into a Franchise Agreement to obtain a franchise from Franchisor to operate a retail outlet located at Fayette Mall, 3615 Nicholasville Road, Suite 824, Lexington, Kentucky (hereinafter "Fayette"). On or about May 6, 1998 Dolphin renewed the May 6, 1993 Franchise Agreement.

554. The Franchise Agreements between the Franchisor and Dolphin are hereinafter referred to as " Dolphin Franchise Agreements."

**Franchisor's breach of supply obligations**

555.   Pursuant to the terms of Dolphin Franchise Agreements, Dolphin orders all its products from Franchisor. The products are then shipped from Franchisor's warehouse. Since the shift to outsourcing and the event of reduced warehouse inventory, at any given time, thirty to forty percent of the products ordered by Dolphin are out of stock and are not shipped with its orders.

556.   As a result, Dolphin was and continues to be unable to meet its customer's demand for products, therefore it has lost and continues to lose retail sales and return business.

557.   The supply deficiencies caused by Franchisor have also caused numerous other problems for Dolphin. Franchisor has no system of back ordering in regard to out of stock products. When an ordered product is out of stock, Dolphin must continually contact the warehouse to check on the availability of the product thus causing it to lose valuable time. Dolphin's lack of product is also causing an erosion of its customer base thus contributing to declining sales.

558.   Franchisor will not reorder a product until the systemwide inventory has been depleted to a certain level. The use of this systemwide inventory method has resulted in Dolphin not being able to procure certain products. Dolphin's inability to procure the products in this regard is due to the fact that although there is sufficient product available to satisfy the minimum required systemwide level, the product is either located in Company Stores and/or consists of earmarked product in Franchisor's warehouse and is not accessible to Dolphin.

559. Franchisor repeatedly and constantly fails to make available to Dolphin, either through its designated supplier or directly from Franchisor, certain products and continues to fail to make products available to Dolphin in sufficient quantities to meet the demand of Dolphin's retail customers.

560. Franchisor has failed to provide products to Dolphin.

561. As a result of the failure to supply products, Franchisor is in violation of paragraph 3.7 of Dolphin Franchise Agreements.

**Franchisor's discrimination against the Plaintiff**

562. The FOAD system favors Company Stores at the cost of Dolphin.

563. Upon information and belief, Catalogue Division orders are automatically shipped from the existing stock available in the warehouse.

564. The threatened imposition of the C.O.D. Plus program on Dolphin puts an undue and discriminatory burden upon Dolphin. Company Stores, which are not required to participate in this program, face no hardships created by the arrangement.

565. That Franchisor's systemwide inventory calculation method is discriminatory in that it favors Company Stores and Catalogue Division at the cost of Dolphin and constitutes a breach of Dolphin Franchise Agreements.

566. Despite repeated requests, Franchisor has refused to order additional products until the systemwide inventory decreases below a specific level.

567. The discriminatory treatment of Dolphin by the imposition of the FOAD system, the systemwide inventory method and the threatened imposition of the C.O.D. Plus program constitutes a breach of Dolphin Franchise Agreements.

568. Franchisor discriminatorily supplied products to Company Stores and Catalogue Division.

569. As a result of the discriminatory treatment, Franchisor is in violation of paragraph 3.7.1 of Dolphin Franchise Agreements.

**Franchisor's breach of The Body Shop Charter**

570. Franchisor has failed to adhere to the principles as set forth in The Body Shop Charter.

571. Upon information and belief, Franchisor supplied to Dolphin products that contained primarily synthetic materials and chemicals and were not naturally-based.

572. Upon information and belief, Franchisor's products or ingredients were tested on animals.

573. Upon information and belief, the sourcing of Franchisor's raw materials and labor used in producing Franchisor's products has had a negative impact on both the environment and the indigenous populations and violated the principles of environmental conservation, fair trade and human rights that Franchisor embodied in the charter and mission statement.

574. Franchisor has ceased accepting the recyclable containers and Franchised Stores now must discard them due to the lack of recycling facilities.

575. Franchisor has failed to adhere to the principles outlined in The Body Shop Charter and Mission Statement.

576. By failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in Dolphin Franchise Agreements.

**Failure to adhere to the New Way of Doing Business.**

577.    At The Committee for Progress meetings, the Plaintiffs directly or through their representatives routinely brought certain problems to the attention of Franchisor. Paramount among these problems was the inadequacy of Franchisor's supply system. Franchisor repeatedly promised that changes would be made to the system in an effort to resolve the supply and other problems.    Franchisor has not taken action concerning the overwhelming majority of these promises and more specifically has done nothing to resolve the supply problems faced by Dolphin.

578.    In July 2000, Franchisor unilaterally disbanded The Committee for Progress. Franchisor has also severely curtailed Dolphin's participation in other conferences, which it now promotes.

579.    Franchisor has failed to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

580.    By failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement, Franchisor has breached its obligations and duties agreed to in Dolphin Franchise Agreements.

581.    As a result of the foregoing, Dolphin has been damaged in an amount to be determined by the court, but believe to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

## FORTIETH COUNT ON THE BEHALF OF THE DOLPHIN COMPANY, INC. AGAINST FRANCHISOR
### Breach of Contract / Rescission

582.    Dolphin repeats and reiterates the allegations contained in paragraphs 1 through 46 and 552 through 581.

583. Franchisor breached Dolphin Franchise Agreements by failing to make products available to Dolphin.

584. Franchisor breached Dolphin Franchise Agreements as a result of the discriminatory treatment of Franchisor's supply policy;

585. Franchisor breached Dolphin Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement;

586. Franchisor breached Dolphin Franchise Agreements by failing to adhere to the principles of the new way of doing business as outlined in The Body Shop Charter and Mission Statement.

587. The foregoing breaches were material and substantial.

588. By reason of the foregoing, Dolphin is entitled to rescission of Dolphin Franchise Agreements entered into by Dolphin for Fayette and for full restitution of any sums.

### FORTY-FIRST COUNT ON THE BEHALF OF
### THE DOLPHIN COMPANY, INC. AGAINST FRANCHISOR
Breach of Contract -- Implied Covenant of Good Faith and Fair Dealing

589. Dolphin repeats and reiterates the allegations contained in paragraphs 1 through 46 and 552 through 588.

**Franchisor's breach based on Discriminatory Supplying.**

590. Franchisor repeatedly and constantly failed to make available to Dolphin, either through its designated supplier or directly from Franchisor, certain products, while at the same time made such products available to its Company Stores and Catalogue Division.

591. Franchisor continues to fail to make products available to Dolphin in sufficient quantities to meet the demand of Dolphin's retail customers while maintaining full stocks at Company Stores and filling the orders of Catalogue Division. This action by Franchisor is discriminatory in that it favors Company Stores and Catalogue Division at the expense of Dolphin.

592. As a result, Dolphin was and continues to be unable to meet its customer's demand for products, therefore, it has lost and continues to lose retail sales and return business.

593. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Dolphin Franchise Agreements.

**Franchisor's breach of The Body Shop Charter and Mission Statement.**

594. Franchisor through The Body Shop Charter and Mission Statement put forth the concept of a "new way of doing business."

595. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Dolphin Franchise Agreements.

**Franchisor's breaches in the implementation of the "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than retail cost.**

596. Since its installation in Dolphin's stores, the "STS" system has never worked properly in that it has not produced the promised "timely and accurate data and reports." The claimed time saving benefits have not been realized. In fact, the reports that the program generates for Dolphin are inadequate. Dolphin must spend additional funds in accounting fees to put the raw data in an useful form.

597. Upon information and belief, Franchisor has obtained an undisclosed financial or other benefit from the installation of the STS system in franchisees' stores. Such benefit was derived at the expense of Dolphin.

598. Franchisor's significant discounting prices of products by Company Stores and Catalogue Division has caused Dolphin to lose current sales and profits.

599. Franchisor by threatening the implementing of its C.O.D. Plus program in a discriminatory manner will impose an unnecessary and extremely burdensome obligation on Dolphin.

600. Franchisor's actions as aforesaid constituted a breach of the implied covenant of good faith and fair dealing contained in Dolphin Franchise Agreements.

601. As a result of Franchisor's breach of the covenant of good faith and fair dealing, Dolphin has sustained damages in an amount to be determined by the court.

## FORTY-SECOND COUNT ON THE BEHALF OF
## THE DOLPHIN COMPANY, INC. AGAINST FRANCHISOR
Implied Covenant of Good Faith and Fair Dealing Breach of Contract / Rescission

602. Dolphin repeats and reiterates the allegations contained in paragraphs 1 through 46 and 552 through 601.

603. Franchisor breached Dolphin Franchise Agreements as a result of its discriminatory supply policy.

604. Franchisor breached Dolphin Franchise Agreements by failing to adhere to the principles as outlined in The Body Shop Charter and Mission Statement.

605. Franchisor breached Dolphin Franchise Agreements in the implementation of "STS" system, the threatened implementation of the C.O.D. Plus program and its policy of selling products at lower than Dolphin's cost.

606. The foregoing breaches were material and substantial.

607. By reason of the foregoing, Dolphin is entitled to rescission of Dolphin Franchise Agreements entered into by Dolphin for Fayette and for full restitution of any sums.

## FORTY-THIRD COUNT ON THE BEHALF OF
## THE DOLPHIN COMPANY, INC. AGAINST INTERNATIONAL
Breach of Contract

608. Dolphin repeats and reiterates the allegations contained in paragraphs 1 through 46 and 552 through 609.

609. International guaranteed the performance of the obligations of Franchisor under Dolphin Franchise Agreements.

610. International failed to perform its obligations to Dolphin under the guarantee.

611. Dolphin reasonably relied upon the guarantee of performance when it entered into Dolphin Franchise Agreements with Franchisor.

612. International through its guarantee undertook an affirmative duty to ensure that Dolphin was supplied with adequate stock.

613. International failed to provide Dolphin with stock of its proprietary skin and hair care product while supplying franchisees outside the United States with stock.

614. By failing to adhere to its obligations under the guarantee, International has breached its obligations and duties agreed to in the guarantee.

615. As a result of the breach of contract, Dolphin has been damaged in an amount to be determined by the court.

WHEREFORE, Plaintiffs demand judgment as follows:

1.     Earth Care demands judgment in its favor against Franchisor, on the First Count for an amount believed to be in excess of Three Hundred Thousand Dollars ($300,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorney's fees and costs and such other relief as the Court deems just and proper.

2.     By reason of the foregoing, Earth Care is entitled to rescission of Earth Care Franchises Agreements entered into by Earth Care for Galleria and Crestwood and for full restitution of any sums.

3.     Earth Care demands judgment in its favor against Franchisor, on the Third Count for an amount believed to be in excess of Three Hundred Thousand Dollars ($300,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorney's fees and costs and such other relief as the Court deems just and proper.

4.     By reason of the foregoing, Earth Care is entitled to rescission of Earth Care Franchises Agreements entered into by Earth Care for Galleria and Crestwood and for full restitution of any sums.

5.     Earth Care demands judgment in its favor against International, on the Fifth Count for an amount believed to be in excess of Three Hundred Thousand Dollars ($300,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorney's fees and costs and such other relief as the Court deems just and proper.

6. Marks & Sparks demand judgment in its favor against Franchisor, on the Sixth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorney's fees and costs and such other relief as the Court deems just and proper.

7. By reason of the foregoing, Marks & Sparks is entitled to rescission of Marks & Sparks Franchises Agreements entered into by Marks & Sparks for Horton and for full restitution of any sums.

8. Marks & Sparks demands judgment in its favor against Franchisor, on the Eighth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorney's fees and costs and such other relief as the Court deems just and proper.

8. By reason of the foregoing, Marks & Sparks is entitled to rescission of Marks & Sparks Franchises Agreements entered into by Marks & Sparks for Horton and for full restitution of any sums.

10. Marks & Sparks demands judgment in its favor against International, on the Tenth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorney's fees and costs and such other relief as the Court deems just and proper.

11. La Rae demands judgment in its favor against Franchisor, on the Eleventh Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars

($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fee's and costs and such other relief as the Court deems just and proper.

12. By reason of the foregoing, La Rae is entitled to rescission of La Rae Franchises Agreements entered into by La Rae for State Street and for full restitution of any sums.

13. La Rae demands judgment in its favor against Franchisor, on the Thirteenth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

14. By reason of the foregoing, La Rae is entitled to rescission of La Rae Franchises Agreements entered into by La Rae for State Street and for full restitution of any sums.

15. La Rae demands judgment in its favor against International, on the Fifteenth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

16. La Rae Partners demand judgment in its favor against Franchisor, on the Sixteenth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-

judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

17.     By reason of the foregoing, La Rae Partners is entitled to rescission of La Rae Partners Franchises Agreements entered into by La Rae Partners for Diversey and for full restitution of any sums.

18.     La Rae Partners demands judgment in its favor against Franchisor, on the Eighteenth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

19.     By reason of the foregoing, La Rae Partners is entitled to rescission of La Rae Partners Franchises Agreements entered into by La Rae Partners for Diversey and for full restitution of any sums.

20.     La Rae Partners demands judgment in its favor against International, on the Twentieth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

21.     Saira demands judgment in its favor against Franchisor, on the Twenty-first Count for an amount believed to be in excess of Three Hundred Thousand Dollars ($300,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

22.     By reason of the foregoing, Saira is entitled to rescission of Saira Franchises Agreements entered into by Saira for St. Georges and Chestnut and for full restitution of any sums.

23.     Saira demands judgment in its favor against Franchisor, on the Twenty-third Count for an amount believed to be in excess of Three Hundred Thousand Dollars ($300,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

24.     By reason of the foregoing, Saira is entitled to rescission of Saira Franchises Agreements entered into by Saira for St. Georges and Chestnut and for full restitution of any sums.

25.     Saira demands judgment in its favor against International, on the Twenty-fifth Count for an amount believed to be in excess of Three Hundred Thousand Dollars ($300,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorney's fees and costs and such other relief as the Court deems just and proper.

26.     S.E.A. demands judgment in its favor against Franchisor, on the Twenty-sixth Count for an amount believed to be in excess of Four Hundred Fifty Thousand Dollars ($450,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorney's fees and costs and such other relief as the Court deems just and proper.

27.     S.E.A. demands judgment in its favor against Franchisor, on the Twenty-seventh Count for an amount believed to be in excess of Four Hundred Fifty Thousand

Dollars ($450,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

28. S.E.A. demands judgment in its favor against International, on the Twenty-eighth Count for an amount believed to be in excess of Four Hundred Fifty Thousand Dollars ($450,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

29. Greenhaus demands judgment in its favor against Franchisor, on the Twenty-ninth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorney's fees and costs and such other relief as the Court deems just and proper.

30. By reason of the foregoing, Greenhaus is entitled to rescission of Greenhaus Franchises Agreements entered into by Greenhaus for Cordova and for full restitution of any sums.

31. Greenhaus demands judgment in its favor against Franchisor, on the Thirty-first Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorney's fees and costs and such other relief as the Court deems just and proper.

32. By reason of the foregoing, Greenhaus is entitled to rescission of Greenhaus Franchises Agreements entered into by Greenhaus for Cordova and for full restitution of any sums.

33. Greenhaus demands that the Franchisor purchase plaintiff's franchise, pursuant to the Buy Back Policy, for an amount equal to the total investment made by plaintiff, inclusive of operating losses, in connection with its purchase and operation of its franchise.

34. Greenhaus demands judgment in its favor and against International, on the Thirty-second Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), plus pre-judgment interest thereon, together with punitive damages in an amount to be determined by the Court, post-judgment interest, reasonable attorney's fees and costs and such other relief as the Court deems just and proper.

35. Raven demands judgment in its favor against Franchisor, on the Thirty-fourth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

36. By reason of the foregoing, Raven is entitled to rescission of Raven Franchises Agreements entered into by Raven for Santa Monica and for full restitution of any sums.

37. Raven demands judgment in its favor against Franchisor, on the Thirty-seventh Count for an amount believed to be in excess of One Hundred Fifty Thousand

Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

38. By reason of the foregoing, Raven is entitled to rescission of Raven Franchises Agreements entered into by Raven for Santa Monica and for full restitution of any sums.

39. Raven demands judgment in its favor against International, on the Thirty-eighth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

40. Dolphin demands judgment in its favor against Franchisor, on the Thirty-ninth Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

41. By reason of the foregoing, Dolphin is entitled to rescission of Dolphin Franchises Agreements entered into by Dolphin for Fayette and for full restitution of any sums.

42. Dolphin demands judgment in its favor against Franchisor, on the Forty-first Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-

judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

43. By reason of the foregoing, Dolphin is entitled to rescission of Dolphin Franchises Agreements entered into by Dolphin for Fayette and for full restitution of any sums.

44. Dolphin demands judgment in its favor against International, on the Forty-third Count for an amount believed to be in excess of One Hundred Fifty Thousand Dollars ($150,000.00), to be determined by the Court after trial of this action, plus pre-judgment interest thereon, together with post-judgment interest, reasonable attorneys fees and costs and such other relief as the Court deems just and proper.

45. The Plaintiffs hereby demand jury trial in this action.

This, the 28th day of December, 2000.

Michael Einbinder (AWS)

Michael Einbinder
ROSEN, EINBINDER & DUNN, P.C.
Attorneys for Plaintiff
641 Lexington Avenue
New York, New York 10022
Phone: (212) 888-7717
Facsimile: (212) 980-1444

North Carolina Counsel

Allan W. Singer
State Bar #4010
McNair Law Firm, P.A.
Two First Union Center
301 South Tryon Street, Suite 1615
Charlotte, North Carolina 28282
Phone: (704) 347-1170
Facsimile: (704) 347-4467